UNITED STATES of America, Plaintiff,

v.

PUBLIC UTILITIES COMMISSION OF the State of CALIFORNIA, Defendant.

No. 3510L.

United States District Court N. D. California, S. D. April 30, 1956.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for plaintiff.

Everett C. McKeage, San Francisco, Cal., for Public Utilities Comm.

Gordon, Knapp & Gill, Los Angeles, Cal., for California Mfg. Assn.

Before LEMMON, Circuit Judge, and OLIVER J. CARTER and HAMLIN, District Judges.

LEMMON, Circuit Judge.

"To git thar fustest with the mostest men" was the recipe for victory announced by General Nathan Bedford Forrest, the Confederate cavalry leader.

There is as much military wisdom in that dictum today as there was a century ago. In this atomic age, speed in the movement of men and supplies is still necessary.

In the instant case, the theory of the plaintiff, as expressed in its complaint, is that if Section 530 of the Public Utilities Code of California, as amended in 1955, infra, hereinafter referred to as "Sec. 530", is held to apply to shipments made by the plaintiff, "it would greatly impede the discharge by the United States of its constitutional powers and responsibilities by inevitably causing delays in such shipments when time is of the essence and in many situations would expose to the public patterns of movement and traffic which would be subject

to interpretation by the intelligence agents of foreign powers and might jeopardize the security of the United States."

At the trial, the plaintiff put on a parade of witnesses whom we have found to be impressive. Most of them were officers in the Department of Defense, one of them being a brigadier general of the Army. Those witnesses were most emphatic in declaring that the application of Sec. 530 to military freight shipments would be costly and time-consuming, and would have a "chaotic" effect upon the defense activities of the United States.

█ The defendant, on the other hand, both in its testimony and in a most solemn unilateral stipulation by its chief counsel, infra, insisted that it would apply Sec. 530 in a manner that would not impede the plaintiff's defense measures. We may point out in passing, however, that neither the defendant nor its learned chief counsel can bind their successors by even the most impressive testimony or the most solemn "stipulation". But we do not bottom our decision upon this ground.

We are convinced of the complete honesty and good faith of each party to this suit. We believe that the record contains not a single sentence of perjurious testimony. We think that each witness, in the language of the day "called it as he saw it".

But the crucial question here presented can be resolved by neither the assurance of responsible defense witnesses nor counsel's formal avowal that the statute would be "reasonably" applied to the plaintiff's shipments and the interests of the United States would in no wise be injured. The problem before us is not one of *administrative discretion* but of *Constitutional* power:

May a State statute *empower* a State Commission, however patriotic and well-intentioned that Commission may be, to "permit common carriers to transport property at reduced rates for the United States, state, county or municipal governments, *to such extent and SUBJECT* *to such conditions as IT may consider just and reasonable"?* [Emphasis supplied]

Reluctant as we are to declare invalid any part of a State statute, we are impelled to hold that, insofar as the plaintiff is concerned, that part of Section 530 which purports to limit the plaintiff's enjoyment of reduced freight rates according to the defendant's pleasure, is in contravention to the Constitution of the United States, as placing an improper restriction upon the plaintiff in the exercise of its sovereign powers related to the national defense.

### 1. Statement of the Case

On December 2, 1955, the plaintiff filed a complaint in the above-entitled cause, to have this Court declare that certain sections of the California Public Utilities Code, infra, are unconstitutional, and to have the California Public Utilities Commission permanently enjoined from taking any action under those sections.

On the same day, Judge CARTER signed an order to show cause and a temporary restraining order, supported by a "Verification and Affidavit" by Captain F. L. Haerlin, USN, together with an order to show cause why an *interlocutory injunction* should not issue during the pendency of the action.

On December 22, 1955, a motion to dismiss the complaint was filed. That motion was denied on February 17, 1956, and by agreement the temporary restraining order was continued in effect in lieu of an interlocutory injunction.

On January 27, 1956, a large group of common carriers filed a motion to intervene as defendants. That motion was denied, "without prejudice to the right of the applicants in intervention to appear amicus curiae in further proceedings in this case."

On February 3, 1956, the California Manufacturers Association filed a motion to appear as amicus curiae. That motion was granted.

On February 6, 1956 Major Generals Paul F. Yount and John P. Doyle, of the

United States Army and the Department of the Air Force, respectively, filed affidavits to the effect that the allegations of the complaint are true, to the best of their information and belief. They are the transportation heads of their respective branches of the armed forces.

The defendant filed its answer on February 27, 1956.

### 2. The Complaint

The plaintiff alleges that in July, 1955, the California Legislature amended Sec. 530 of the Public Utilities Code and deleted therefrom "the express exemption from the general provisions of the Code of Shipments of property" of the plaintiff. California Stat.1955, Ch. 1966. This amendment likewise expressly provided that carriers could grant reduced rates to the plaintiff only with the permission and under conditions determined by the defendant.

It is averred that insofar as Sec. 530 and related sections of the Public Utilities Code prohibit carriers from shipping property for the United States at rates different from those approved by the defendant, they are void under Article VI, par. 2 of the Constitution of the United States, in that:

1. For no valid reason within the police powers or other reserved powers of the State, they place an unreasonable burden and impediment on the United States in the discharge of its Constitutional powers and responsibilities.

2. They place an unreasonable burden on interstate commerce in an area under the exclusive jurisdiction of Congress, under the Constitution.

3. They contravene the policy of Congress implicit in the Federal Property and administrative Services Act of 1949, 63 Stat. 377, relating to the negotiation for the transportation of property for the plaintiff, and enacted pursuant to the power conferred upon Congress by the Constitution.

4. Insofar as the Public Utilities Code of the State imposes penalties upon common carriers for failure to ship property for the plaintiff at rates other than those approved by the defendant, it is repugnant to Amendment XIV of the Constitution, in that it is vague and uncertain because it imposes upon carriers the duty of resolving intricate questions of law and fact in determining what particular shipments of persons or property may be in intrastate or in interstate commerce.

Wherefore it is prayed that, on final hearing, judgment be entered declaring that insofar as Section 530 "and related provisions prohibit carriers within the State from shipping property" of the plaintiff "at rates other than those approved by the defendant, it [sic] is unconstitutional and void"; and that the defendant be permanently enjoined from making any effort to prohibit carriers within the State from negotiating and making arrangements and contracts for the carriage of property of the plaintiff at rates and charges other than those determined by such contracts and arrangements between the plaintiff and the carriers.

### 3. The Motion to Dismiss

The motion to dismiss and its supporting brief set forth that:

1. The Court lacks jurisdiction over the subject matter of the complaint, because:

(a) The complaint does not allege an "actual controversy" within the meaning of 28 U.S.C.A. § 2201, and the plaintiff therefore is not entitled to a declaratory judgment.

(b) The plaintiff has failed to exhaust the administrative remedy available to it in a proceeding before the defendant.

(c) The complaint involves a matter within the primary jurisdiction of the defendant as an administrative agency of the State.

(d) This Court is prohibited by the Johnson Act, 28 U.S.C.A. § 1342, from granting the relief requested by the plaintiff. The Johnson Act is as follows:

"The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a

public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

"(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

"(2) The order does not interfere with interstate commerce; and,

"(3) The order has been made after reasonable notice and hearing; and,

"(4) A plain, speedy and efficient remedy may be had in the courts of such State."

(e) The plaintiff will not suffer irreparable injury in the absence of injunctive relief by this Court, but has an adequate remedy elsewhere. On the contrary, persons other than the plaintiff have suffered, and will continue to suffer, irreparable injury as a result of this Court's granting the plaintiff's request for injunctive relief. " * * * the Commission, in compliance with this Court's restraining order, indefinitely suspended the cancellation of a provision in Minimum Rate Tariff No. 2, and thereby continued, for an indefinite period of time, the opportunity for some carriers to hold rates at a 'depressed and unreasonably low level'."

(f) The Court is required by law to abstain from granting the relief requested by the complaint in order to preserve comity in the relationship between the plaintiff and the State of California.

(g) The subject matter of the complaint is within the exclusive jurisdiction of the State.

2. The complaint fails to state a claim upon which relief can be granted. In addition to the "deficiencies" already pointed out, there are additional defects: "Most of the allegations of the complaint are not well pleaded for one reason or another. They are either vague, or ambiguous, or conjectural, or irrelevant, or conclusions rather than specific allegations of fact. " * * * the only things left are allegations that the California Legislature amended Section 530 of the Public Utilities Code, and that the application of such amended statute will result in increased cost and expense to the United States in the transportation of its property. * * * [These two allegations] do not furnish any basis for relief by this Court."

4. *The Plaintiff's Position*

The plaintiff's brief was filed after that of the defendant, and is partly in answer thereto. Its main points are stated in its complaint, which is, to a certain extent, argumentative and contains considerable background material.

In addition, the brief asserts:

I. The Court has jurisdiction over this action, because the "gravamen of the plaintiff's case lies in its assertion that from the nature of the rate regulating process any subjection of it to the process will directly and drastically interfere with its constitutional responsibilities, principally that of supplying the armed services."

II. The plaintiff's lines of supply are such that any local interference with them is a matter of national concern.

III. Any state statute that places an unreasonable burden or impediment on the discharge of a federal function is unconstitutional. The local interest involved must be balanced against the national interest with which the statute interferes.

IV. The defendant's regulation of rates for carrying the plaintiff's property would seriously interfere with the lines of supply and place a great burden on the officers of the United States charged with responsibilities in the supply function.

V. The defendant's regulation of rates for carrying the plaintiff's property would not benefit the citizens of California in any way whatsoever. The contrary would be true.

VI. Many shipments that appear to be *intrastate* are in fact *interstate* because they are in the stream of interstate commerce or are shipped to or from places over which the plaintiff has exclusive jurisdiction. Any effort to apply

Sec. 530 in such situations would result in confusion, friction, and needless litigation.

VII. Pursuant to its Constitutional powers, Congress has clearly expressed the policy that all shipments for the plaintiff shall be made by special arrangements, and Sec. 530 as amended is directly contrary to this policy.

5. *Section 530, as Amended*

On July 12, 1955, Sec. 530 of the Public Utilities Code of California was amended to read as follows:

"Every common carrier * * * may transport, free or at reduced rates: (a) *Persons* for the United States, state, county, or municipal governments, or persons or property for charitable or patriotic purposes * * *. The commission may permit common carriers to transport property at reduced rates for the United States, state, county, or municipal governments, *to such extent and subject to such conditions as it may consider just and reasonable. Nothing herein shall prevent any common carrier subject to the provisions of this part from transporting property for the United States, state, county, or municipal governments, at reduced rates no lower than rates which lawfully may be assessed and charged by any other such common carrier or by highway permit carriers * * *.*" [California Stat.1955, c. 1966] [Emphasis supplied]

Before the amendment, the first sentence of Sec. 530 read in pertinent part as follows:

"Every common carrier subject to the provisions of this part may transport, free or at reduced rates:

"Persons *or property* for the United States," etc.

The deletion of the two emphasized words has given rise to the present controversy.

6. *The Testimony*

The first and principal witness for the plaintiff was Brigadier General Edmond C. R. Lasher, Assistant Chief of Transportation of the Army for Traffic, who represented the Department of Defense in his testimony. Although fourteen witnesses testified at the five-day trial, General Lasher's testimony, covering more than one hundred pages, takes up nearly one-fifth of the 552-page transcript.

General Lasher was an intelligent, forthright, and impressive witness. He told the Court that "The policy of the Department of Defense is to utilize the commercial transportation industry of the United States to the fullest extent possible."

"This policy," the witness continued, "has been adopted primarily on the theory that the broader that common carrier base in the United States is, the better prepared transportationwise we will be in the case of emergency, and therefore we utilize military-owned transportation to a minimum extent and only where commercial transport cannot meet the requirements of the particular traffic involved."

(a) *The "Pattern of Traffic"*.

A trifoliate standard is observed by the plaintiff in choosing "the modes of transportation for the armed services", General Lasher explained:

"The first requirement, of course, in all our transportation is to select that carrier within that mode which best accomplishes the requirements of the particular traffic involved. The needs of the government are, of course, paramount. Secondarily, the question of cost is involved; and thirdly, the division of traffic amongst the carriers who are able to carry it."

There are "many, many points of difference between commercial requirements * * * and military requirements for transportation", and commodities in military traffic "are never in competition" with commodities in commercial traffic, the general said.

"As a matter of fact," he added; "oftentimes they are moving opposite to the flow of commercial or industrial traffic."

The "pattern of traffic" for the plaintiff generally "must follow the flow of requirements" and *cannot be fixed by State boundaries*, General Lasher emphasized.

### (b) *Commodity versus Class Rates*

The Army transportation expert explained the rate-making procedures for the transportation of government materiel in the plaintiff's depot system.

"Our goods move generally on tariffs," General Lasher stated, "but as we find penalty class rates applying to our traffic, we ask the carriers to sit down and negotiate with us. That is done on a direct basis with the carriers under the provisions of * * * Section 22 of the Act to regulate interstate commerce.[1] The rate and arrangements finally agreed upon, or finally proffered, I will say, by the carrier or carriers is a rate voluntarily given and a rate which, in most cases we believe is a rate that carrier can move the traffic for and still make a profit on his business."

The outgrowth of *commodity* rates from *class* rates was then traced by the general:

"Well, it's the law that carriers must— we will take the railroads—must be able to quote a rate to a prospective customer on any item from any point in the United States to any other point in the United States. It was apparently impossible to price each and every item of commerce. So these items of commerce were placed in about a dozen classes. However, it is quite obvious that there would be no movement of oranges from Maine to Florida, yet there is an applicable rate in these class rates.

"As commerce grew, industry spread out, it was necessary to afford industry a cost of movement more nearly geared to the requirements of that movement, so that the goods upon arrival at destination were not too costly for the consumer, and a system of commodity rates in lieu of class rates grew up.

"The commodity rate is a rate from a point of manufacture, let's say, to a point of distribution or consumption, which is based upon a volume move, based upon the facility of the manufacturer to get his goods to market, allowing him as much in the way of profit as possible and the carrier, too. So we find that commodity rates generally move commerce in the United States today. Class rates do not. As a matter of fact, they are popularly referred to as paper rates, rates which are on the books to satisfy the law."

### (c) *Spark Plugs, Doughnuts, and a Korean Bottleneck*

After describing at some length the "depot system" of the Army in particular and the Department of Defense in general, the military transportation expert illustrated the need of speed in supplying the needs of the armed services, by graphically describing a "bottleneck" involving the lowly spark plug.

"There is no substitute for a part, for an item, if you don't have it," General Lasher said. "And I would like to stress the importance of making this system work.

"Among other of my duties I was transportation officer of the Eighth Army during the first year in Korea, and we had a lot of truck companies over there, a lot of trucks. The length of Korea was such that we had to use a great deal of transport, and particularly as we raced north to the Yalu River. * * *

"The sad part of it was that we had many trucks deadlined, out of commission for lack of parts; and [of] three of the ordinary items [of] which we were in shortest supply, one was spark plugs, one was spring leads, and one was sealed beam headlights—items which I knew

---

1. The opening words of that lengthy section are: "Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States," etc., 49 U.S.C.A. § 22.

were coming off the production [lines] in the United States like doughnuts. Spark plugs tumbling off! I could see them! *We couldn't get a spark plug.* Not because there weren't spark plugs available, but because the logistics system wasn't working for one reason or another.

"Nothing must be placed as an impediment to the complete flexibility and flow of movement of supplies to our troops in foreign theaters, whether it's in peace or in war."

(d) *"We Would Never Win the War!"*

In reply to a question regarding the effect that State regulation of rates for intrastate shipments of the plaintiff's materiel "would have on the supply lines and logistical system of the United States," General Lasher said:

"If we were * * * forced to go to State regulatory bodies in order to arrange for the movement of our traffic and the rates upon which it moves, we would find ourselves in a time-consuming job of spreading before the public the requirements of the military.

"First of all, let me say that it is only until recently that I have had to take into consideration whether certain of our traffic was or was not interstate, and in attempting to prepare myself somewhat, I tried to read some law and I was—I found out that I was terribly confused, that it would be very difficult for me to distinguish in most cases, for we do not know when an item starts out on its journey from the processor whether it is going to be consumed in North Dakota or Florida or Cambodia.

"Now, one of our difficulties right away would be for the clerks in our thousands of post camps, stations and bases throughout the United States, our clerks to determine whether this item was intra or interstate. It apparently is a rather moot question at law, let alone at the administrative level of a clerk earning $3500 or $4000 a year.

"Now, then, for us to make these arrangements at the Washington level with the various states, let us say 48 states, with 48 varieties of methods to follow, we would find ourselves in an administrative *morass* out of which we would never fight our way, *we would never win the war!* Our negotiations for these arrangements, and I don't say just rates, but our negotiations for arrangements for the movement of traffic must be flexible; they must be direct with the parties in interest, *and they must be as secure as possible.*

"We haven't touched on the security yet, but security is of primary importance to us * * *. Were we to spread * * * the record of the characteristics of our freight before the public and the parties at interest, we would seriously jeopardize that security, and in some cases be in violation of the law."

(e) *The Security Problem*

Expatiating upon the security phase of the problem, General Lasher continued:

"There are many items which move today which are not described, some items which are willfully misdescribed in order to hide their identity, and they are moving in quantity. The only people who know what they are are about four. The carrier, whether he be a highway carrier or rail, usually doesn't know what he is carrying; but he has been told by one of his officials that that is what he will carry and the billing will be such and such and the security of that item is thereby maintained.

"Were we to have to go through a regulatory body, we would never be able to accomplish this."

The general added that State regulation of rates would tend to increase the freight bill of the Federal Government:

"Getting back to these class and commodity rates again, the proce-

dure would be so cumbersome and so time-consuming that we would, in desperation, ship on the class-rate structure rather than wait for the procedures to be consummated and thereby increase considerably our transportation cost."

In 1955, "a peacetime year, rather quiet year," the Department of Defense spent about a half billion dollars. In "a typical wartime year", the expenditure was "four to five billion dollars", the general stated.

If the various States regulated the rates for the intrastate shipment of military matériel, the Department of Defense would have "to increase our force many times, in my opinion", General Lasher declared.

"Maybe not 48 times," he explained, "but we would have to be ready to concurrently handle with several of the State regulatory bodies concurrently at the same time. So that we would have to have a multiplicity of groups, if you will, so that they could be handling concurrently so as not to delay things any more than necessary."

Finally, the entire depot system of the plaintiff would probably have to be rearranged, General Lasher asserted.

"Our depots are now set, upon the present system, whereby we can with facility make arrangements according to it. If we have 48 different jurisdictions, the pattern of our traffic will necessarily change because of the 48 different ideas as to how our traffic should * * * flow, and depending upon the pattern which falls [flows?] out from those various jurisdictions, we would then have to adjust our logistics system to comply with the new circumstances rather than the circumstances with which we find ourselves confronted now."

### (f) *The Power Is the Threat*

On cross-examination, General Lasher conceded that the defendant "or any other state commission, for that matter, would be most receptive to any representations we of the military might have before such hearings."

"But," he added, "the mere fact that we would have to make such representations is to me the crux of this. Again I go back to my original testimony wherein I stated that the mere fact that we have to spread the record with things which we might not want to spread the record with is inimical to our best interests."

Emphasizing that the plaintiff is "alarmed" not by the defendant's administration of the power given to it by Sec. 530, but by *the existence of the power itself*, the General testified:

"However magnanimous the Commission itself might be, or at any one time, depending upon its makeup, or however uncompromising it may be, depending upon some other makeup, what we view with alarm is an obvious intent to further regulate our logistic system by regulating the traffic which moves for it."

The witness conceded that he had "no reason to think that the Commission will not act reasonably".

The plaintiff's transportation expert also conceded that, although the present system is "good", there have been some few "abuses" under Sec. 22. In enlarging upon this statement, General Lasher testified:

"Individual carriers will at times, in order to capture traffic which they might otherwise not have, quote for the Government under the umbrella of Section 22, rates far below the going rate in order to get a small piece of business. This abuse is very difficult to eradicate. However, the number of carriers by any mode of transportation who resort to that practice are, in the total number of carriers involved, very, very few."

The General added that he would advocate one change in the Interstate Commerce Act; namely:

"A wording * * * to allow of such administrative procedures as would prevent the abuses which I mentioned a while ago. I said we were constrained to accept a low rate. We are constrained to do so.

because if we do not, then in the opinion of some people we are squandering the taxpayer's money. We do not want to be placed in that position. Therefore, if administratively we could have the authority and the Comptroller General of the United States also had the mandate from Congress, we could so administer Sec. 22 as to prevent these very abuses."

(g) *The Problem of Segregation.*

Lieutenant Colonel George A. Hall, Chief of the Transportation Division of Sharpe General Depot at Lathrop, California, testified that the Depot was carrying 61,800 "line" items a few days before he appeared in court. That figure did not include items used in repair and maintenance, "nor the items themselves that are in maintenance, such as bulldozers and locomotives and that sort of thing". The Depot ships primarily to points in the West Coast, in the Sixth Army area, embracing eight Western States. The turnover at the Depot is approximately 15,000 tons per month at the present time, "in and out".

The transportation expert testified that the Depot has "interstate and intrastate matériel so commingled that we could not possibly segregate it". He added that if the defendant assumed jurisdiction over the regulation of rates on the shipments from Sharpe, it would "just be impossible at the present time" to determine what matériel was in fact interstate and what was intrastate, in so far as the regulations were concerned.

In addition to supplying the armed services, the Sharpe Depot stores strategic materials, and also serves "as a source of supply" in disaster relief.

"One normally thinks of the Army in connection with a military disaster," Colonel Hall said. "Actually, that is not entirely correct. Take the recent flood. We are prepared, ready to go to work in case of any *civilian* disaster.

During the flood we shipped approximately 225 truckloads of either flood relief material or equipment to fight the flood. * * * At the present time * * the sources of danger in the area are considered, number one, earthquake; second, fire; third, flood; fourth, enemy action. We are prepared to go on 24-hour duty in the event of any disaster."

Colonel Hall remarked that there are a number of movements which are so urgent and to such out-of-the-places that there is no appropriate rate structure for them.

(h) *A "Completely Chaotic" Situation*

Replying to a question regarding what would happen at Sharpe if the restraining order in this case, supra, were lifted, "and the statute as you understand it went into effect", Colonel Hall testified:

"Well, I can't imagine operating under such circumstances. *The situation in my office would be COMPLETELY CHAOTIC!* * * * We would have a lot of additional rating to do other than the physical handling, as I see it. I only have one rate clerk in my office, who is rating comparatively few shipments now. As I see it, he would be rating a good many under the circumstances described. * * * If we did try to consolidate it all, we would have to try to consolidate according to the freight classification rather than the present broad description that we are now able to operate under. * * * It would be a considerable burden upon my office. I would guess that it would increase our costs of billing—I am talking of the billing alone, the accomplishment of the paper work— some 40 per cent. It costs us $1.71 at Sharpe to issue each bill of lading. That is just the paper work of having a bill of lading prepared. The more complicated it becomes and the more bills of lading * * that we issue, obviously that cost is going to go up. Of course, it would result in additional costs out on the shipping floor. * * * the increase in paper work would go all the way up the line. There are more

pieces of paper, more bills of lading, more shipping documents, and all the way up to finance and general accounting office, there would be additional paper work as a result."

Another difficulty would arise in the negotiation of rates, Colonel Hall stated.

"I do not know just how it is contemplated that we will negotiate for rates. When I say 'we' I mean the Department of the Army as a whole, how we would negotiate for rates. I would assume that it would require a series of officers in various localities to appear before the various state regulatory bodies. Of course, it would seem to me that they would impose a considerable burden upon the installations themselves asking for supporting data and testimony. I am not very well equipped at my place. We are strictly an operations office, not a statistical office, and I could not spare the time at the moment for too much of that."

### (i) *The Spy's Jigsaw Puzzle*

On the subject of required secrecy in certain cases, Colonel Hall stated that "really over a period of time *every military shipment is in a sense a security shipment.*"

"I had some experience in Europe in that situation," the Lieutenant Colonel explained. "A trained intelligence worker, espionage worker, can develop an amazing amount of accurate information just through looking at the records, say, for a month's time on our very prosaic shipments—shoes, medical supplies and food. Actually, a month's record of shipments to an installation will indicate how many troops are there, the status of training of the troops, the status of their health and their overall motion as well as their ultimate destination."

Colonel Hall added that he did not think it would be possible to reveal the necessary data for logical and reasonable rate approval purposes in connection with many of the shipments that are secret in nature.

"If everything is to be made public, we might as well publish it in the newspapers," he declared.

On cross-examination, the transportation expert said that he did not know whether the defendant would require the publication of all the records of carriers transporting secret Government material.

"They *could,* under the circumstances, I would say," the officer remarked.

Regulation by the defendant as contemplated by the statute in question would interfere in certain Governmental shipments to the following extent, Colonel Hall testified:

"* * * now the office of Chief of Transportation can go direct to a competent carrier, or group of carriers, and explain the situation and whatever dealings are made are done very rapidly and easily, direct with the carriers. As I see it, in such a case as this, we would be going through the State Commission and we would not, in such case, necessarily deal directly with the carrier."

Lieutenant Colonel Andrew Paul Flanagan, Transportation Corps, Regular Army, stationed at Washington, D. C., testified that he is "charged with the responsibility for negotiating rates with commercial carriers, nationwide, for the movement of Department of Army freight". He stated that the regulation of rates by State Commissions for the movement of Government properties would interfere and impede him in the discharge of his responsibilities.

"If this situation should spread to other States," he continued, "we would be faced, in my opinion, with an intolerable situation. We would be deprived of the flexibility and the expeditious methods we now have of establishing rates on army military traffic."

### (j) *"The Need to Know"*

Colonel Flanagan discussed the "need-to-know" basis of security information, the principle of which had already been explained by General Lasher.

"In the case of where the carrier has a representative with a carrier's security clearance, I will tell that individual, not everything about the shipment, but all that he needs to know. We must realize that this classification, if a man is cleared for top secret, you do not have to tell him everything. It is on a need-to-know basis. You tell him only what he needs to know. I tell him sufficient information about that traffic so he knows that what we are asking for is just and reasonable, and he is satisfied, and this is the only man that I have to convince —no one else."

Giving only "the skeleton facts" of a certain secret movement, *which was still taking place at the time he was testifying,* Colonel Flanagan told how his office and the carrier established a rate that represented a saving of about $500,000 as compared with the "class rate".

"We would have been faced on this movement [with] classification by analogy, which would have thrown us into a very high class-rate structure. There are also certain arrangements to be made—emergency arrangements and airplane— [we?] discuss this matter with the freight traffic manager of the carrier concerned.

"Incidentally, he did not know anything outside the origin and destination. He didn't know what the actual commodity was and I couldn't tell him what the actual commodity was.

"The shipment is moving in substantial volume, trainload lots. The difference between the two rates, you might say, the class rate structure and the rate we established, which incidentally gave the carrier a revenue of over $2.00 a car a mile on the rate we did establish, *was approximately a half a million dollars on that move.*"

The Colonel also testified regarding a similar saving of $73,000 on a small-arms and ammunition shipment from Belmont, Arizona, to an air field in Utah.

(k) *Wasting Time by the Truckload*

Lieutenant Commander Gordon W. Bengtson, Supply Corps, United States Navy, is in charge of the Navy Central Freight Control Office at the Naval Supply Center, at Oakland, California, which carriers "hundreds of thousands" of items.

Commander Bengtson thus enumerated the various burdens that the application of Sec. 530, as amended, would place upon his office:

"We would be required to ship under the rates established under the PUC minimum. * * * We would be required to classify every item in the shipment. * * * A shipping activity went through the process of completely classifying a shipment, a 40,000 pound truckload shipment, and approximately 13 hours were expended, 13 man hours were expended in complete classification of all the items in this truckload shipment."

The naval officer expressed the opinion that a delay of that sort might be crucial for operational purposes in the Navy. He said:

"If we were required to meet a deadline to ship material to ships operating where it would be required we ship on very short notice, those additional hours required to completely classify the shipment might result in a delay in meeting that deadline."

Commander Bengtson commented that such a delay might result in the ship's leaving port without the item on board, or, if the item was important enough, it might result in the ship's not sailing.

If "this new rate structure" went into effect, the personnel in his organization would have to be increased "approximately 50 per cent", Commander Bengtson said. The 13 additional hours required to classify completely the shipment "represents labor costs, and the 13 additional man hours would be approxi-

,mately $25 a truckload." Bills that his office has already studied, "just through our main channels of traffic, reflect increases [in rates] up to 45 per cent".

Under Navy regulations, the nature, the direction, weight, etc., of shipments of security material for purposes of rate-making could not be revealed, Commander Bengtson said.

On cross-examination, the commander testified that "Where there is any doubt as to the interstate or intrastate nature of a shipment, we utilize carriers that have both operating rights, interstate and intrastate."

### (l) *Speed Is of the Essence*

Colonel Herbert C. Chambers, commanding officer of the Air Force district traffic office at Mira Loma, California— an "office * * * composed of technicians"—expressed the view that State regulation of intrastate shipments of Air Force material between points in California would "definitely" interfere with his mission at Mira Loma.

"I say 'definitely'," he explained, because we—our logistics system is based on *speed* and we cannot tolerate anything that would interfere with speed. And, as I have pointed out previously, this Air Force mission is worldwide, and I think every one recognizes the importance that Strategic Air Command has played in present world affairs."

Referring to "security-type shipments", Colonel Chambers testified that "we wouldn't want to reveal the number of shipments that do develop, nor the numbers [number?] of missiles that are involved or the points of origin and destination. We would certainly not * * want to do it, and we would conceal that in so far as possible."

### (m) *"Would Hamper and Hinder"*

Lieutenant Colonel Walter H. Eastham, United States Marine Corps, officer in charge, Marine Corps Fleet Control Office, San Francisco, California, testified that the imposition of the minimum rate classification—the defendant's regulation of rates—would severely hamper and hinder him in carrying out his duties.

"To begin with," he asserted, "it would require a slow-down in our movement of freight. It would cause * * * that the classification would be required. Since our traffic is very unique and different, we have to ship many thousands of different items and in many different directions, and itemwise our IBM stock records indicate that we have approximately 450,000 items in our stock system, control system, that is used to ship to the various activities.

" * * * the commodities are very difficult to be continually classified under one group * * *, they are all different, there is an admixture. If we have an emergency shipment it would require us to pay, in my opinion, a higher charge, and all in all I just think it would cause us considerable inconvenience all the way through."

Colonel Eastham added that the defendant's regulation of rates for the shipment of Marine Corps matériel would increase that service's "freight bill", and that such State regulation would "definitely" interfere with the shipments of secret material "in so far as the classification of equipment, or a requirement for going before the Commission and explaining the type of equipment" is concerned.

There would be difficulty in distinguishing between interstate and intrastate matériel, the Marine Corps officer added.

"However," he continued, "it is our policy that where there is any question as to whether it is interstate or intrastate, we attempt to get carriers that have both rights, even though the charge is greater."

### (n) *A Civilian Expert's Viewpoint*

So far we have considered the testimony of official spokesmen representing the Army, the Navy, the Air Force, and the Marine Corps. It may be helpful now to examine the viewpoint of a representative of the Western railroads,

who expedites the handling of freight rate matters for the plaintiff.

We refer to Leonard Hill, of Washington, D. C., who testified that he has been employed "in various capacities by the western railroads for the past 39 years, and [that] most of those years were spent in handling the matter of freight rates for commercial shippers and for the Government."

Mr. Hill agreed with other Government witnesses that "the regulation of rates for the shipment of Government property by State Commissions" would seriously interfere with the plaintiff in the discharge of its responsibilities of supplying the armed services. He also expressed the view that the present system of rate adjustment for the plaintiff is a good one.

"And I would like to add this, if it please the Court", Mr. Hill continued, "The railroads of the United States have had a good deal of experience in the handling of Government freight, and it's a matter of record during World War II 97 percent of the military traffic of the United States moved by rail.

"The present system is based on experience with it, and it fits the needs of the traffic and the needs of the traffic are directly involved with the national defense."

Several other witnesses, both military and civilian, testified on behalf of the plaintiff, but we believe that the individuals quoted above supplied evidence that amply supported the Government position.

(o) *The Case for the Defendant*

The first of the defendant's three witnesses was Tal Loretz, a self-employed traffic and transportation consultant, familiar "in a general way" with transportation rates in California.

Mr. Loretz testified that there was "need for some interdependence and some type of regulation, if you please, on Government traffic, because it is only a part of the overall traffic movement."

The witness explained that the freight-all-kinds ("f. a. k.") rates in California "have been generally subject to a 20,000 pound load that would be subject to one level of rate, a 30,000 pound load or shipment would be subject to a somewhat lower basis, and either a 36,000 or 40,-000 pound load or shipment, which is normally the highest for a truckload movement, is accorded a still lower rate."

Much of Mr. Loretz's testimony was highly technical, being given in part in connection with exhibits showing freight rates and their adjustments in California since 1952.

(p) *"Throwing the Book Out the Window"*

Mr. Loretz expressed himself as opposed to "f. a. k." "as applied to various kinds of moves".

"When you establish a freight-all-kinds rate, you in effect throw the book out the window," he declared. "You say that regardless of whether it's a steel billet or steel bar, on the one hand, or it's a mattress or an airplane wing or something, on the other, that we move them both at the same rate. * * *

"So the carriers have attempted at different times to set up some protection to themselves whereby, whether it be a steel beam or a mattress, why, they could be assured of a certain amount of minimum revenue per loaded mile.

"That is one phase. I have dwelt on that at some length because that is one phase of the deterioration of the California Government-rate structure which cannot be expressed just in figures. * * * my opinion is that the same rate applicable to the steel beam and the bulky airplane wing is, on its face, *wrong*."

It is this inequity, Mr. Loretz continued, that makes it necessary "that there should be some regulatory agency which could determine if and when there may be some special conditions to justify freight-all-kinds rates, and if there is any reason for them, to tie them down appropriately so as to avoid a burden being placed on other traffic which the carrier has to move, not only for the Government but for the public at large."

He added that the f. a. k. rate has been abused in California.

"I can conceive from the military standpoint," Mr. Loretz explained, "we will say, if an entire division is being moved from one location to another, it might be expedient for both the shipper and the military, as well as the carrier, to just have one rate on military impedimenta, and to take the good with the bad and average it out, so to speak, as any contractor might do in any other field.

"But I would like to point out particularly that your freight-all-kinds rate, as they [sic] have been in effect in California for the past several years, they go 'way beyond that purpose. *They apply on the whole load of steel bars or they apply on a load of mattresses.*

"It isn't a question of balancing your load between the two and avoiding a minute description of the entire shipment. It's a question of a rate which, if it's a good rate for one, it is obviously a bad rate for the other article, all of which is included within that broad description."

(q) *"Only an Impartial Regulatory Body Can Resolve It."*

By way of summary of this part of his testimony, the traffic expert asserted that freight-all-kinds rates "certainly should be scrutinized most carefully, and I don't know of any one other than an impartial regulatory body that can resolve the problems that have developed here in California through the use and abuse of freight-all-kinds rates."

On cross-examination, Mr. Loretz was asked whether, "in controversial cases, * * * where the normal channels of due process were followed, * * * it would be possible to get a decision out of the [defendant] in less than 30 days". He replied:

"As to commercial traffic, I would say that 30 days is probably pretty conservative. As to what the Commission might do on military traffic, as you have stated, if there are unusual conditions there, I couldn't

say. I am sure they will find the means of meeting that situation, though.

"Q. But so far as you know now, no such rules have been promulgated or proposed?

"A. There are none in effect on commercial traffic."

And on that muted note, Mr. Loretz's testimony ended.

Robert A. Lane, senior rate expert in the defendant's Transportation Department, was the next witness. Much of his testimony was in connection with a three-page typewritten document prepared under his direction by J. P. Haynes, Publishing Agent for all rails in California, and entitled "Pacific South Coast Freight Bureau Tariff No. 300, Cal. P.U.C. No. 102", etc. The exhibit was designed to show commodity rates between principal California shipping points, and covered items ranging from cable to canned goods, and from soap to sinks. Even at that, however, Mr. Lane testified that "these are a very, very small portion of the commodity rates in California. There are literally thousands of them."

Soap is a "heavy-moving commodity", Mr. Lane believed, and he included it in his list also because "certainly it is a commodity the military uses, and I wanted to show that we have commodity rates for commercial business for a general commodity such as that."

"One of the further purposes of this exhibit," Mr. Lane testified, is to combat the alleged inference that "there were no commodity rates in California available for the movement of traffic."

"The class rates, yes, they move l. c. l. traffic and carload traffic," Mr. Lane conceded, "but I think volumewise the class rates move only about a third of the traffic weightwise."

(r) *The "Piggyback" Plan*

The witness told of the "piggyback" system—"a movement of the rail traffic in a trailer, an automotive vehicle trailer of a subsidiary of the rail carrier."

"The vehicle body, the trailer," he explained, "picks up the shipment, is load-

ed in there with use generally of the driver, and it is hauled to a rail yard where it is loaded on a flat car. * * * The trailers on flat cars are hauled over the rail lines to the terminal area, and in the terminal area they are unloaded and delivery is made from the trailer."

Mr. Lane stated that under California law motor vehicle carriers are at liberty to charge the rates that appeared in the rail tariff shown in his exhibit.

James W. Mulgrew, Director of the Transportation Division of the defendant, was the final witness. After reviewing the history of regulation of transportation in California since 1911, Mr. Mulgrew stated that for many years certificated carriers in California had the "unqualified right" to charge reduced rates for the plaintiff. This applied to "fixed terminal carriers and to the railroads," but not to "the highway contract or radial highway common carriers, who had no such right."

The defendant's transportation chief stated that he knew of no reason why commodity rates for the movement of Government traffic could not be granted "with the proper showing". He added that he saw "no reason" why regulation by the defendant "should necessarily cause delays".

(s) *"Rates Could Be Made Effective Retroactively"*.

"In view particularly of the fact that there is no competition that I know of between the Government and individual shippers at all likely, I should think that the rates could be made effective retroactively much as they are done—much as they are made under the present system. * * *

"Now, the second point that I have, on delays, is the difficulty of classification of commodities where large numbers of different items are included in a lot. If I followed the testimony of the Government witnesses correctly, it seems to me that that rests on a misconception. It's not necessary under our system of rates that the particular freight for a particular truck be segregated and rated as one shipment. You can make the tender of the entire lot, whether it be one truckload, ten truckloads, or a hundred truckloads, as one shipment, and the lowest truckload rates will apply to the entire string of trucks, regardless of how the category may be stowed in particular trucks.

"So * * * if I followed the testimony correctly, I don't see that there should be any delay attributable to rating, * * *."

On the subject of security, Mr. Mulgrew testified that the only thing that he could see to do "is to exempt that by some sort of a general order of the Commission, exempting the traffic from minimum rates or any sort of rate establishment upon certification by a competent military authority that this is restricted traffic, or secret traffic." He added that he would be prepared to recommend that sort of an order to the defendant.

(t) *Unregulated Rate Making "Creates the Opportunity for Abuses"*.

Mr. Mulgrew testified that letting carriers be free to quote rates to the plaintiff "creates the opportunity for abuses that would not be present if there were some *screening*, shall we say, of the Government rates." The witness designated General Lasher's reference to that as an "abuse", and added:

"The danger, as I see it, is that * * * if rates get below cost, any rates, Governmental rates or commercial rates, the carriers can't long survive, or they will have to offset the unremunerative traffic with higher than necessary rates on other traffic.

"There is a situation here, I think it is peculiar to California, where the carrier making the contract with the shipper in turn hires some other carrier to do the actual hauling. That transaction between the two carriers is not regulated ratewise except in the case of dump truck traffic, and so these carriers, called independent subcontractor haulers, may take freight at less than remunerative rates in order, as one witness said, to get 'gas money' * * *

There are some 15,000 of these permit carriers, many of them driver-owner operators."

The witness added that Sec. 530, as amended, does not require public hearings, and that it will be possible for the defendant to set up certain procedures for expediting requests by carriers or by the plaintiff itself with respect to the plaintiff's traffic.

"We have emergency situations that arise in commercial traffic and they are taken care of," Mr. Mulgrew commented.

On cross-examination, counsel for the plaintiff read from the defendant's "excellent report for the year 1954–1955" showing that the trucking industry for that fiscal year had a gross revenue of $550,730,134, "an all-time high".

Regardless of what might be happening in particular instances in the Government traffic, Mr. Mulgrew agreed that the trucking industry in California "as a whole is one that is sound," adding:

"I think we have a very adequate transportation system and in reasonably good financial health."

Counsel for the plaintiff introduced the defendant's report, saying:

"In a Constitutional question of this sort we balance the needs of the State regulation and balance against that the harm that would actually be done to the Federal Government in the carrying on of its Constitutional responsibilities on a national scale, and for that reason it seems to be very pertinent to know whether the situation here in California as a whole demands any drastic action at this time."

Of the 15,500 trucking companies in California that are authorized to carry Government traffic, about 500 are certificated—"common carriers in the sense that they must serve all who tender them traffic within the limit of their common carrier undertaking", Mr. Mulgrew stated.

(u) *Defense Counsel Stipulates*

Immediately before both parties rested, Judge Everett C. McKeage, chief counsel for the defendant made the following unilateral stipulation:

"I will stipulate that I will officially advise the Public Utilities Commission that it has lawful authority pursuant to Sec. 530 * * and other provisions of [the Public Utilities] Code, to authorize any carrier to negotiate with the United States with complete freedom concerning the transportation of any property of the United States which may involve security matters, provided only that the carrier require a certificate from a responsible Federal official, which certificate shall be filed with the Commission, that such transportation involves security matters; and in my opinion, such advice will be accepted by the Commission and acted upon.

"I further stipulate that I will officially advise the * * * Commission that it has authority pursuant to Sec. 530 * * * and other provisions of said Code to grant any and all lawful authority requested under said section of said Code without the necessity of a public hearing, and grant such authority effective immediately, and that such advice will be accepted and acted upon."

Judge McKeage then cited some law to the effect that the Commission "may make its orders effective immediately," and repeated that he would so advise the defendant, "and in my opinion they will accept and act upon" such advice.

7. *This Court Has Jurisdiction Over the Subject Matter of the Complaint.*

In a 54-page brief, with voluminous appendixes, the defendant argues that this Court should sustain the motion to dismiss. It would unduly lengthen an already lengthy opinion to discuss in detail the defendant's many contentions, some of which overlap. We have carefully considered each point, and will review the principal ones briefly.

The first major attack upon the complaint is that it fails to show that this

Court has jurisdiction over its subject matter. Seven separate grounds are set forth for this contention. We will glance at each.

(a) *The Complaint Describes an "Actual Controversy"*.

■ The defendant asserts that the complaint "does not allege an 'actual controversy' within the meaning of [28 U.S.C.A. § 2201], and the plaintiff therefore is not entitled to a declaratory judgment". We have already fully summarized the complaint and the evidence adduced in its support: no unbiased reader of the record can fail to see that a real and pressing controversy does exist between the parties. We have also set out the salient provisions of Sec. 530. Sections 2110–2112 provide fines and imprisonment for violations of the Public Utilities Act. If a United States officer were to negotiate with a carrier for "reduced rates" without permitting the defendant to determine whether it "considered" the conditions of the contract "just and reasonable", he could be thrown into the county jail. He at least would speedily be convinced that there existed a "controversy" between his Government and the State of California!

The defendant cites Public Service Commission of Utah v. Wycoff Co., 1952, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291, and Public Utilities Commission of California v. United Air Lines, 1953, 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140. We believe that neither case is in point. In *Wycoff*, the plaintiff sought a declaratory judgment that its carriage of motion picture film and newsreels between points in Utah constituted *interstate* commerce, and that the Public Service Commission of Utah should be forever enjoined from interfering with such transportation over routes authorized by the Interstate Commerce Commission. *The plaintiff specifically disavowed any attack upon the constitutionality of any Utah statute or the validity of any order of the State Commission.* 344 U.S. at pages 239–240, 73 S.Ct. at page 238. The Supreme Court held that the suit could not be maintained. In *United Air Lines*, the controversy centered around the question of whether air transportation between Santa Catalina Island and the mainland of California was subject to the jurisdiction of the present defendant or to the Civil Aeronautics Board of the United States. A three-judge District Court held that the United Air Lines, Inc., was entitled to a decree declaring the Civil Aeronautics Board to have exclusive jurisdiction over the plaintiff air line. There, again, there was no question of the constitutionality of a State statute. The Supreme Court reversed, on the authority of *Wycoff*. Neither case aids the present defendant.

(b) *The Plaintiff Was Not Obliged to "Exhaust" Any "Administrative Remedy" By Instituting a Proceeding Before the Defendant.*

■ In the instant suit, the plaintiff does not question the propriety of an act of the defendant, but asserts that Sec. 530 is unconstitutional in so far as it purports to authorize the defendant to regulate the rates for the carriage of the plaintiff's goods. The defendant contends that "the plaintiff has failed to exhaust the administrative remedy available to it," and cites six Supreme Court cases as supporting that statement. We have examined each of those six decisions, and find that *not one dealt with the constitutionality of a State statute.*

On the contrary, in Panitz v. District of Columbia, 1940, 72 App.D.C. 131, 112 F.2d 39, 41, Associate Justice Vinson of the Court of Appeals for the District of Columbia, and later Chief Justice of the United States, cautioned against permitting administrative agencies to pass upon the constitutionality of statutes. The learned jurist said:

"Did the assessor, as an administrative official, have inherent power to rule on constitutional objections to the tax? It has been said that the necessities of our system require the *judiciary* to determine the constitutionality of Acts of the legislature. There can be little doubt that it represents the highest exercise of

judicial power, and one that even the judiciary is reluctant to exercise. Interruption of the machinery of government necessarily attendant on this function not only cautions the judiciary *but argues as well against its exercise by other agencies*. It is this consideration for the orderly, efficient functioning of the processes of government which makes it impossible to recognize *in administrative officers any inherent power to nullify legislative enactments because of personal belief that they contravene the constitution*. Thus it is held that ministerial officers cannot question the constitutionality of the statute under which they operate. Likewise, it has been held that an administrative agency invested with discretion has no jurisdiction to entertain constitutional questions where no provision has been made therefor. In respect to taxation it is frequently stated that one need not pursue his administrative remedy where the tax is void. *Here again is apparent a reluctance to invest non-judicial agencies with jurisdiction to rule on the validity of statutes*." [Emphasis supplied.]

(c) *The Complaint Is Not Bottomed Upon a Ground That Is Within the Primary Jurisdiction of the Defendant as an Administrative Agency.*

■ The defendant claims "primary jurisdiction" in this case on the ground that the complaint recites that "Since time would be of the essence, it would be impossible to obtain Commission approval of rates and, accordingly, shipments by the United States would be thrown into the class rate, which as applied to such shipments is recognized as unrealistically high," etc. From this recital the defendant seeks to spell out jurisdiction for itself, because "this allegation calls for a determination of whether or not 'class rates' covering such shipments are 'unrealistically high' because of certain alleged peculiar characteristics of such shipments". It is therefore argued that such decision "calls

for the exercise of an informed administrative judgment".

The defendant here overlooks the fact that the gravamen of the complaint is not that the plaintiff would have to pay unrealistically high rates if Sec. 530 were applied to it, but that the section is void under Article VI, par. 2 of the Constitution in that:

"1. For no valid reason within the police powers or other reserved powers of the State of California, [Sec. 530 and related sections] place an unreasonable burden and impediment on the United States in the discharge of its constitutional powers and responsibilities under Article I, Sec. 8, Clauses 7, 12, 13, 16 and 17, and Article IV, Section 3, Clause 2, of the Constitution of the United States."

Thus it is clear that this action is based upon the *unconstitutionality* of Sec. 530, principally because it interferes with the plaintiff's discharge of its Constitutional powers and duties relating to the raising and the support of "Armies and a Navy". The first sentence of Article 1, Section 8 of the United States Constitution gives Congress the power to "provide for the common Defense and general Welfare of the United States". How the application of Sec. 530 would "hamper and hinder" the plaintiff in carrying out its Constitutional functions has been clearly shown by the testimony of high-ranking officers of the armed services. This "hampering and hindering" is not principally the result of the application of "class rates". The Constitutional objection, as we have seen, goes far deeper than that.

■■ It is well settled that a state statute which places an unreasonable burden upon the discharge of a Federal function is unconstitutional.

Nearly a century and a half ago, Mr. Chief Justice Marshall laid down this fundamental principle, which he observed "may be almost termed an axiom". In McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 426–427, 4 L.Ed. 579, the historic jurist said:

"This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them. * * *

"It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operations from their own influence. This effect need not be stated in terms. It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain. We must, therefore, keep it in view while construing the constitution."

And, in connection with Judge McKeage's solemn avowal, supra,—an avowal in which we have the utmost confidence —we can only say, in the words of Mr. Chief Justice Marshall in this same opinion, "This, then, is not a case of confidence." 4 Wheat. at page 431.[2]

(d) *By Its Plain Terms, the Johnson Act Does Not Apply To This Case.*

 The defendant contends that the Johnson Act, quoted in full, supra, prohibits this Court from granting the relief requested by the plaintiff. We are somewhat surprised that learned counsel seriously urges this point, in view of the fact that *four* conditions to the application of the Act are specified therein, *all* of which must concur, and each of which relates to an order, not a *statute*. Since the conjunction "and" is used as the connecting word between the conditions, it is clear that all four contingencies must be present before the Act can apply.

The very first statutory condition at once makes the Johnson Act inapplicable here; for it sets forth that it comes into play only when "Jurisdiction is based *solely* on diversity of citizenship *or* repugnance of the *order* to the Federal Constitution." [Emphasis supplied.] In the instant case, the jurisdiction of this Court is based principally upon the unconstitutionality of a *statute*, not of an "*order* * * * made by a State administrative agency or a rate-making body," etc.

(e) *The Other Grounds of the Defendant's Attack Upon the Jurisdiction Of This Court.*

The remaining attacks upon the jurisdiction are somewhat related, and will be considered together briefly. They are:

(1) The plaintiff will not suffer irreparable injury in the absence of injunctive relief, but has an adequate remedy elsewhere.

(2) The Court is required by law to abstain from granting the relief requested in order to preserve comity between the plaintiff and the State of California.

(3) The subject matter of the complaint is within the exclusive jurisdiction of the State of California.

 (1) We have fully summarized the allegations of the complaint. For the purposes of the motion to dismiss, they must be taken as true. The single allegation that the enforcement of Sec. 530 "would greatly impede the discharge by the United States of its constitutional powers and responsibilities by inevitably causing delays in such shipments when time is of the essence and in many situations would expose to the public" "patterns of movement," etc., of itself spells out one ground for equitable intervention. We are here dealing not chiefly with considerations of the market place, but with the plea of a consti-

---

2. See also Osborn v. Bank of United States, 1824, 9 Wheat. 738, 870, 6 L. Ed. 204; Weston v. City Council of Charleston, 1829, 2 Pet. 449, 468, 7 L. Ed. 481; State of Ohio v. Thomas, 1899, 173 U.S. 276, 283, 19 S.Ct. 453, 43 L. Ed. 699; In re Heff, 1905, 197 U.S. 488, 505, 25 S.Ct. 506, 49 L.Ed. 848; Johnson v. Maryland, 1920, 254 U.S. 51, 55–57, 41 S.Ct. 16, 65 L.Ed. 126.

tutional sovereign to be permitted to discharge, without State interference, its duties in connection with its greatest task—the defense of the nation itself.

■ (2) Similarly, in none of the cases cited by the defendant under this heading was the United States Government seeking to have declared unconstitutional a State statute, plain on its face, that by its very terms would subject the Federal sovereign to restrictions and delays in the exercise of its paramount right, power, and duty of providing itself speedily and economically with the engines of self-defense.

■ (3) The defendant contends that the subject matter of the complaint is within the State's exclusive jurisdiction. But the subject matter of the complaint is California's placing "an unreasonable burden and impediment on the United States in the discharge of its constitutional powers" in connection, as we have seen, with the national defense. We do not believe that national defense is "within the exclusive jurisdiction of the State of California." The plaintiff is not attacking the defendant's *general* power to fix rates: it is merely objecting to a statute that by its terms permits a State Commission to impose "conditions" upon the granting of reduced rates to the Federal sovereign, even when they relate to activities connected with the national defense.

Heavy reliance is placed by the defendant upon the case of Penn Dairies, Inc., v. Milk Control Commission of Pennsylvania, 1943, 318 U.S. 261, 270, 63 S.Ct. 617, 87 L.Ed. 748, in which, pursuant to the Pennsylvania Milk Control Law, 31 P.S.Pa. § 700j—101 et seq., a renewal of the license of a milk dealer was refused by the Commission because the dealer, in violation of the state law, had sold milk to the United States below the minima fixed by the Commission. It was there held that such application of the State law to the dealer was not precluded by the Constitution or laws of the United States. Justices Douglas, Black, and Jackson dissented.

In the first place, the State regulation imposed "no prohibition on the national government or its officers." They might "purchase milk from whom and at what price they [wished], without incurring any penalty". Here, however, as we have seen, there are penalties that could be imposed upon any officer of the United States who violates the provisions of the Public Utilities Act. Section 2112 provides:

"Every person who, either individually, or acting as an officer, agent, or employee of a corporation other than a public utility, violates any provision of this part, or fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in such violation or non-compliance, in a case in which a penalty has not otherwise been provided for such person, is guilty of a misdemeanor, and is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment."

But over and beyond this, the Penn case did not involve the procurement of the engines of war. There is a constitutional difference between a milk can and a hydrogen bomb!

8. *The Complaint States a Claim Upon Which Relief Can Be Granted.*

■ As the defendant itself points out, the section of its brief dealing with jurisdiction discusses "certain deficiencies in the complaint". In discussing other alleged "deficiences", in addition to those asserted under the jurisdictional heading, the defendant objects that "Most of the allegations are not well pleaded" "for one reason or another". The entire discussion of these asserted "defects" consumes less than one typewritten page, and ends with the following bare statement:

"When the complaint is stripped of all the allegations that are defi-

cient in one or more of these respects, the only things left are allegations that the California Legislature amended Sec. 530 * * *, and that the application of such amended statute will result in increased cost and expense to the United States in the transportation of its property. Even the second of these allegations is lacking in particularity. Assuming, however, without conceding, that these two allegations are well pleaded, they do not furnish any basis for relief by this Court."

It is clear that this assortment of glittering generalities adds nothing to the legal argument, and that the defendant is relying upon the first section of its brief as expounding the gravamen of its objection to the complaint. The second section contains an extensive vocabulary of adjectives, such as "vague", "ambiguous", "conjectural", and "irrelevant", but does not greatly advance the thought.

9. *Conclusion*

In a dictatorship, the warlords do not even *demand*—much less *request*—authority to negotiate with private parties for the supply of their war needs. Autocrats *take* what they want!

It is therefore a heartening spectacle, in a Constitutional democracy, to see a group of military men, speaking for the sovereign itself, appear in a civil court to *plead* to be allowed to carry out their Constitutional functions by being permitted to contract freely with privately-owned carriers to supply the Government's transportation needs.

But this very subordination of the military to the civil power—fundamental in every true democracy—itself imposes a grave responsibility upon civil courts. We dare not, in good conscience and under the Constitution of the United States, deny relief to such a suitor when it proves to our satisfaction that such denial would hamper the national defense.

Such proof the present plaintiff has produced in abundance. We do not believe that a federal court, after listening to such testimony and dispassionately reviewing the record, as we have done, can or should stay its hand when legitimate relief is requested by the armed forces of the nation.

Accordingly, we hold that, in so far as Sec. 530, supra, purports to authorize the Public Utilities Commission of California to impose "such conditions as it may consider just and reasonable" upon the granting of reduced rates by commercial carriers in favor of the plaintiff, it is invalid, void, and of no effect, as contravening the provisions of the United States Constitution relating to the national defense, supra. The defendant is permanently enjoined from enforcing any of the restrictive provisions of Sec. 530 as against the plaintiff. Counsel for the plaintiff will prepare proposed findings of fact, conclusions of law, and form of judgment, in accordance with this opinion