State College Borough Authority, Appellant, *v.*
Pennsylvania Public Utility Commission.

364

Argued November 10, 1942. Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Edward J. Thompson,* of *Thompson & Baird,* with him *John Y. Scott,* for appellant.

*Paul D. Larimer,* with him *Harry M. Showalter* and *Claude T. Reno,* Attorney General, for appellee.

*William W. Litke,* of *Fleming & Litke,* for intervening complainants.

*Edward A. G. Porter,* with him *Saul, Ewing, Remick, & Harrison, Murray Forst Thompson, David Getz, John A. Moss, John Ray, Ellwood J. Turner* and *S. R. Zimmerman,* for Northampton Borough Municipal authority, Lehighton Water Authority, Mount Penn Mu-

nicipal Authority, Beaver Falls Municipal Authority and Chester Municipal Authority, under Rule 61.

*Ellwood J. Turner,* for Central Delaware County Authority and Darby Creek Joint Authority, under Rule 61.

OPINION BY KENWORTHEY, J., April 20, 1943:

On April 1, 1936, the Borough of State College acquired the properties of the State College Water Company which had supplied water to the public, both within and without the borough, at a uniform minimum rate of $3 per quarter for 12,000 gallons. On January 1, 1938, the Borough increased the rate to consumers outside the borough to $4 per quarter without any increase to consumers within. On September 15, 1941, appellant, the State College Borough Authority, incorporated pursuant to the Act of June 28, 1935, P. L. 463 as amended, 53 PS §2900f et seq., acquired the properties from the Borough and immediately increased the rates to consumers outside the borough to $5 per quarter for 10,000 gallons with no change in the rates to consumers within the borough except the reduction from 12,000 to 10,000 gallons of the allowance for the minimum rate.

In January 1942, the present complaint was filed by consumers outside the borough, alleging that the rates as to them were unjust, unreasonable and discriminatory. The commission upheld the complaints, ordered appellant to revert to the rates previously charged by the Borough, and ordered a refund of all charges collected in excess thereof. The Authority appealed.

The appeal involves three principal questions: (1) Does section 301 of the Public Utility Law, Act of May 28, 1937, P. L. 1053 as amended, 66 PS §1101 et seq., subject the rates of appellant to regulation and control by the commission for water service outside the borough

limits? (2) If so, is the title of the act defective and in violation of article III, section 3 of the State Constitution? (3) If question 1 is answered in the affirmative and 2 in the negative, does the evidence sustain the charge that the rates are unreasonable or discriminatory?

*First.* Does the Public Utility Commission have jurisdiction?

Whether or not this question was raised below, we are bound to consider it. *Com. ex rel. Mees v. Mathieu,* 107 Pa. Superior Ct. 261, 163 A. 109; In re *Brusstar's Estate,* 123 Pa. Superior Ct. 45, 186 A. 147.

Section 301 (as amended by Act of March 21, 1939, P. L. 10, No. 11, §2, 66 PS §1141), provides: "Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission: Provided, That only public utility service being furnished or rendered by a *municipal corporation,* or by the operating agencies of any municipal corporation, *beyond its corporate limits,* shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility." (Italics supplied). Section 2(15) provides: " 'Municipal Corporation' means all cities, boroughs, towns, townships, or counties of this Commonwealth, and also any public corporation, authority, or body whatsoever created or organized under any law of this Commonwealth for the purpose of rendering any service similar to that of a public utility."

We think the natural, unstrained reading of the proviso of section 301, in the light of the definition which includes a municipal authority within the term 'municipal corporation', suggests a meaning that is clear; it gives to the commission regulatory jurisdiction over the public utility service of municipalities and their

authorities beyond the corporate limits of the municipality; and that if the legislature had intended to deprive the commission of *all* power over the rates of authorities, it would have said so, either in section 301 or in the Municipality Authorities Act. It would have been an extremely simple matter to have done so. Yet, in spite of the absence of any plain language—the use of which it employed when it decided, by an amendment to the Municipality Authorities Act in 1939 (53 PS 2900n), to take away the commission's jurisdiction over the *acquisition* of property—appellant attempts to spell out the intention by using a subtle, ingenious argument based principally upon the inappropriateness of the expression 'corporate limits,' in section 301, as applied to an authority.

Because of the importance of the question and the zeal and skill with which appellant's position has been submitted to us we shall discuss the arguments in some detail.

It is important to bear in mind that appellant concedes that if its rates are not subject to regulation by the commission injured consumers have a remedy in the court of common pleas under the Act of June 16, 1836, P. L. 784, 790, §13, 17 PS §§281, 282, as extended by Act of February 14, 1857, P. L. 39 §1, 17 PS §283. See *Barnes Laundry Co. v. Pittsburgh,* 266 Pa. 24, 109 A. 535. We emphasize this at the outset because it disposes of a number of arguments advanced in the brief filed under Rule 61 which, if valid, would give appellant complete immunity from regulation.[1]

And before facing the main problem, we shall dis-

---

[1] For example, that the Municipality Authorities Act authorizes appellant to fix, charge and collect for its services reasonable rates, "to be determined by *it*"; that since the Amendment of 1939 to section 9 of the Municipality Authorities Act gave appellant the right to *acquire* property "without reference to any other law," (53 PS §2900n) it would be inconsistent to hold it cannot fix rates with similar impunity.

pose of another preliminary argument. It is urged that
the power to regulate the rates of authorities would
prejudice the rights of bondholders and run counter to
the provisions in the Municipality Authorities Act that
bondholders have the right to mandamus the authority
to charge and collect rates which are adequate to en-
able it to carry out the terms of its agreement with
them.[2] This position, if valid, would mean that not
even the court would have regulatory power, yet, as we
have just pointed out, appellant expressly concedes that
it has. It may be the Act has thus placed a special
limitation on rate regulation of municipal authorities.[3]
It does not follow that no regulatory power exists.
And the existence of such special limitation is not the
slightest help in determining where the regulatory
jurisdiction vests, whether in the court or in the com-
mission.

It is conceded that if the Borough had continued
the operation of the water service, the commission
would have jurisdiction over the rates charged to con-
sumers beyond its corporate or territorial limits. Sec-
tion 301 of the Public Utility Law; *Ambridge Borough
v. Pa. P. U. C.,* 137 Pa. Superior Ct. 50, 8 A. (2d) 429.

It must also be conceded that appellant is a public
corporation organized by the Borough to perform the
public utility service for it. See *Lighton v. Abington
Twp.,* 336 Pa. 345, 9 A. (2d) 609. And although it is
not, in law, the agency of the Borough, but a separate
entity. (*Williams v. Samuel,* 332 Pa. 265, 2 A. (2d)
834; *Tranter v. Allegheny County Authority,* 316 Pa.
65, 173 A. 289), the Borough is the parent, the Author-

[2] "Such trustee ...... may ...... (a) by mandamus or other
suit, action, or proceeding at law or in equity enforce all rights
of the bondholders, including the right to require the Authority
to collect rates, rentals, and other charges, adequate to carry out
any agreement as to or pledge of the revenues or receipts of the
Authority, ......" Section 6, 53 PS §2900k.

[3] We express no opinion on the validity of the limitation.

370

ity the child. The question narrows down to whether the legislature has made a distinction between them with regard to rate regulatory jurisdiction. Has it indicated an intention to divide the jurisdiction where the borough itself operates the properties and to leave it all to the courts where the public utility service is rendered by its authority?

The argument is: Since an authority has no corporate limits but a municipality has, when the legislature gave the commission regulatory control over a 'municipal corporation' for public utility service beyond its corporate limits it must have referred to a municipality only. But this does violence to the legislative definition in section 2(15) of 'municipal corporation'; the legislature has expressly said 'municipal corporation' includes municipal authority. Moreover, although the question is not before us and we express no opinion on it, if this argument were valid, the effect might be that the commission has jurisdiction over all the rates of appellant. We understand this to be the position taken by Commissioner Buchanan in his brief concurring opinion. A public utility is defined in section 2(17) to mean 'persons or corporations' operating a public utility service. Appellant is a corporation. And that the legislature assumed municipal corporations operating a public utility are included in the broad general definition of a public utility is borne out by the fact that after making a general provision in the first part of section 301 that the rates of 'any public utility' are subject to regulation by the commission, a proviso, which ordinarily implies an exception, is used to specially limit the regulatory power over the rates of municipal corporations.[4] If municipal authorities were

---

[4] Although 'public utility' and 'municipal corporation' are separately defined, it is not unusual to find over-lapping definitions in the same act and it does not necessarily mean that the terms are mutually exclusive. For example, the Vehicle Code,

not intended to be included in the proviso, there may be no limit to the commission's jurisdiction over them.

The alternative argument is equally unpersuasive. The gist of it is: If 'municipal corporation' in section 301 includes a municipal authority, the language of the section must be read literally—that only public utility service furnished by a *municipal authority* beyond *its* corporate limits is subject to regulation by the commission—and that when so read the commission, in reality, has no control whatever over a municipal authority because its 'corporate limits' are its project limits and in this case—in any case in which it renders a utility service beyond the corporate limits of its parent municipality—appellant's 'corporate limits' include all the territory, inside and outside the borough, which it serves. But 'corporate limits' does not mean one thing when applied to a municipality and something else as applied to a municipal authority. By its context it means the same as applied to both. There is no reason why it *could* not mean project limits as applied to a municipality since one which renders utility service beyond its territorial limits may be said to have project limits beyond its territorial limits. But if it were so construed, the proviso to section 301 would be meaningless; it would be a phantom enactment; it would purport to give some jurisdiction and yet give none.

These arguments suggest that the legislature has played fast and loose with words. We again ask: Why should it have resorted to subtle niceties to give to municipal authorities immunity from commission regulation?

Moreover, it seems to us there is a fundamental, although perhaps inadvertent, inconsistency in appellant's position. If, as it contends, its operations are a

Act of May 1, 1929, P. L. 905, art. I §101, 75 PS §1, has an all-inclusive definition of motor vehicle and specific definitions of various types thereof.

single, unified project immune from commission regulation and subject only to regulation by the court, the imaginary line which marks the borough limits should be of relatively little significance for rate-making purposes; a valid classification of its rates depends upon factors which may or may not bear a relationship to the boundary line. Yet it has made an arbitrary discrimination based upon the boundary and seeks refuge in section 304 of the Public Utility Law which provides that: "No rate charged by a municipality (which appellant is not, strictly speaking) for any public service rendered or furnished beyond its corporate limits shall be considered unjustly discriminatory solely by reason of the fact that a different rate is charged for a similar service within its corporate limits." Appellant may be entitled to the benefit of this section, but it certainly is not if we are to apply, in its interpretation, the nice distinctions in language which form the basis of its principal argument.

It is suggested that the fact the commission has heretofore not attempted to regulate municipal authorities is of some significance. Of course, when words of a law are not explicit, the intention of the legislature may be ascertained by considering the administrative interpretations of it. Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV §51, 46 PS §551. But there is no proof that prior to the present case there have been administrative interpretations of the commission's jurisdiction; the only expression on the subject called to our attention is the opinion of the Attorney General that the commission has jurisdiction. The mere silence or inaction of the commission, even though for a substantial period, does not meet the requirements of the principle of statutory construction urged upon us.

It is argued that the legislature's failure to adopt several amendments to the Municipality Authorities Act, offered in 1941, indicates that the legislature has

construed the law as not extending jurisdiction to the commission and did not intend to so extend it. If the amendments proposed and rejected had purported to give to the commission the same, but no more, jurisdiction than it now asserts, the argument might be entitled to some consideration. Copies of the bills were not made a part of the record nor attached to the brief. We have procured them from the Legislative Reference Bureau and examined them. There are five—two in the House and three in the Senate. All of them proposed to extend the regulatory jurisdiction of the commission to *all* public utility services rendered by municipal authorities; and one of them (Senate Bill No. 189) proposed the requirement that they obtain the consent of a majority of the electors of the municipality before acquiring or constructing utility property. If any inference can be drawn from the rejection of these bills and *from the failure of the 'antagonists' of municipal authorities to propose a compromise measure extending the jurisdiction of the commission to services rendered beyond the limits of the municipality,* it is that the 'antagonists,' at least, assumed the commission already had such jurisdiction.

Finally, it is argued that since two or more municipalities may now (Amendment of 1937, 53 PS §2900h) jointly incorporate and operate an authority to render utility service, intolerable difficulties would arise from commission regulation of a part but less than all the services. But complications in rate regulation are relative things. The division of jurisdiction between the courts and the commission over the public utility rates of a single municipality is not entirely free from complicating factors. Wherever there is a division of jurisdiction, they are bound to exist. A common complication arises from the division of jurisdiction between state and federal regulatory bodies over the intrastate and interstate rates of a single operating utility. And

although the performance of its functions may be difficult, there is certainly nothing in this record to indicate that it will be impossible for the commission to perform its duties.

Underlying all these considerations is the constantly recurring question: Is there any valid reason why the legislature should have made a distinction between the regulatory power of the commission as between a municipality on the one hand and its authority on the other? In our opinion none has been pointed out. Prior to the Public Utility Law of 1937, the Public Service Commission had no jurisdiction over a municipally operated public utility whether or not it rendered service beyond its corporate limits. *Shirk v. Lancaster,* 313 Pa. 158, 169 A. 557. A realistic appreciation of the temptation to discriminate against the outside users impelled the change. When a municipality limits its service to its own voters the power of the ballot is perhaps an adequate protection. The officials who manage the property are elected by and, therefore, beholden to the consumers for their power to manage. See *Barnes Laundry Co. v. Pittsburgh,* supra. It is the consumer outside the corporate limits, who has no right to participate in the governmental affairs of the municipality and, therefore, in its selection of management, who needs protection against the natural inclination of management to favor its constituents at the expense of the outsider who has no voice. The basic reasons for the change in the law apply equally to the authority, the creature of the municipality which renders the service for it. Under the Municipality Authorities Act, an authority comes into being by resolution or ordinance of the incorporating borough whose governing body is composed exclusively of citizens of such municipality. (Section 7). We think the natural tendency to discriminate equally strong. And the right of holders of municipal bonds to mandamus the public officials to levy and collect taxes to produce revenues

adequate to pay the bond obligations,[5] which is urged as a valid basis for the alleged distinction, is offset by a comparable right of mandamus expressly given the holders of municipal authority bonds by section 6 of the Municipality Authorities Act.

*Second.* If we thus construe it, is section 301 unconstitutional on the ground that there is nothing in the title of the Public Utility Law to indicate that it includes a municipal authority in the definition of municipal corporation?

We have already indicated the close natural relationship between municipalities and their authorities. Appellant concedes this when it argues it is entitled to the benefit of the provision in section 304 of the Public Utility Law that: "No rate charged by a *municipality* for any public service rendered or furnished beyond its corporate limits shall be considered unjustly discriminatory solely by reason of the fact that a different rate is charged for a similar service within its corporate limits." The title of the Act indicates that it relates to "the regulation of public utilities, including, to a limited extent, municipalities engaging in public utility business," that jurisdiction was conferred upon the Public Utility Commission over "persons, associations, companies, and corporations, including, to a limited extent, municipal corporations subject to the act." Thus the Act, by its title, applies to 'corporations,' 'municipalities,' and 'municipal corporations.' By nature and function, an authority is a corporation of a public character organized by a municipality to render a public utility service and bearing a close relationship to a municipal corporation. In our opinion the title gives ample notice to the reasonably careful readers. *Lehigh Navigation Coal Co. v. Pa. P. U. C.*, 133 Pa. Superior

---

[5] For example, see Act of May 4, 1927, P. L. 519 art. XIII, §1302, 53 PS §13392.

Ct. 67, 1 A. (2d) 540, *Barnes Laundry Co. v. Pitts-burgh,* supra.

*Third.* Does the evidence support the finding of the commission that the rates charged the complainants were unreasonable or discriminatory?

Appellant contends that the burden of proof was on complainants. If it was, the evidence they offered was scarcely sufficient to meet the burden. After proving the difference in rates, they called two former employes of appellant who testified that "the cost of service" outside the borough limits "would be about the same" as within. This was the extent of their proofs; there were no books or records offered. And apart from its general vagueness it fundamentally lacks probative value; the inference is that the costs were being compared on a *per-customer* basis. The cost of water service to a particular customer varies relatively little with the amount of consumption which measures the amount of revenue he pays. Thus, at the same rate, the utility makes a large profit from the large consumer and a small, or perhaps no profit at all, from the small consumer. Obviously, if the cost of serving each is the same or about the same a higher rate to the small consumer class should be allowed. And one of the witnesses stated that the vast majority of customers outside the borough were domestic users who were within the minimum consumption, whereas the large users were within the borough.

On the other hand, the commission contends the burden of proof was on appellant. If it was, the record is equally unsatisfactory. The evidence offered by appellant consisted primarily of an exhibit which purported to justify an anticipated revenue of $5,200 from one hundred and seventy-three customers outside the borough limits. It showed what purported to be the original cost of that part of the plant devoted to serving all customers and then apportioned it on the basis of the *number of customers.* To the amount thus ap-

portioned, it added the reproduction cost of mains, meters, service lines and private fire hydrants serving outside customers. The allowable return was figured by taking 6% of the value thus reached (on the assumption it represented the value of the property used and useful in rendering the service to outside customers), adding an item for depreciation at 1%, the average operating costs for the four-year period, 1938-1941, and (a much controverted item) $1,619 representing the apportioned (again on the basis of number of customers) cost of carrying a debt of $352,000 which was borrowed for the purpose of improving the properties, but virtually none ($30,000 only) of which has been used or can be used because of conditions brought about by the war.

There are a number of things wrong with this exhibit. In the first place, the segregation or separation of the jointly used property, i. e. jointly used for service to both inside and outside customers, for valuation purposes on the basis of the number of customers is wholly invalid. The proper basis for segregating property for rate-making purposes between various types of users and various types of service is a *usage* basis, particularly where, as here, a division of jurisdiction is involved. *Smith v. Illinois Bell Telephone Co.*, 282 U. S. 133, 75 L. Ed. 255. Usage means consumption or quantity of service. In the second place, the alleged rate base was reached without depreciating either the original cost of the property jointly used by both classes of customers or the reproduction cost of that used exclusively by outside customers. And the appellant's effort to compensate for this obviously vulnerable position by setting up a low annual depreciation rate does not necessarily cure the defect. At least, there is nothing in the record to show that it does except the wholly unsatisfactory statement of appellant's engineer that *some* of the plant would not depreciate at

all.[6] In the next place, the operating costs, without any pretense at a break-down, are given as the average for a four-year period. If the costs for each year were given, they might indicate a marked trend either downwards or upwards. The function of the commission is primarily to fix rates for the future and a simple average struck from past annual figures may or may not be valid, depending upon whether the trend, if any, is up or down.

The cost of carrying the unused portion of the debt requires special consideration. When the authority was incorporated, it issued bonds in the amount of $585,000. It paid $233,000 for the property and deposited the balance, $352,000, with the trustee in a 'Construction Fund.'

The commission refused to allow any portion of the interest as an operating expense; it was not asked to include any portion of the principal in the rate base. The fund was intended to be used for what are said to be much needed improvements.

We can take judicial notice of the fact that this country is engaged in a war *(Alko Express Lines v. Pa. P. U. C.,* 152 Pa. Superior Ct. 27, 30 A. (2d) 440) and that the federal government's imposition of material priorities has substantially interfered with, if not entirely prevented, the initiation of the work. $30,-000 of this fund has been expended for engineering services, legal services, land surveys, leakage and wastage survey, purchase of water shed land, the installation of a new main, the enlargement of the main from the distribution reservoir, and 'trustee's fees.' It is obvious that none of the interest paid on the bonds

---

[6] One of the most puzzling unanswered questions about the depreciation feature arises from the abundant evidence that the entire scheme—the creation of the authority and the large borrowings—was predicated on a public demand for improvement of the water system which certainly suggests that it was obsolete or in a dilapidated condition.

is directly reflected in service to the customers. The interest is, therefore, not properly an operating cost. Nor can any portion of the fund (with the possible exception of the $30,000), by the application of any conventional standard, be added to the rate base as representing value of property used and useful in rendering the service. If construction had actually commenced it would be a different matter. The $30,000 already spent, if it is shown to be reasonable and proper to the satisfaction of the commission, may be added to the rate base; if not, it must be classified with the balance of the unexpended sum which we shall now consider.

We are clear that the unexpended portion, the 'Construction Fund,' adds nothing of value to the property used and useful in rendering the service. But, in dealing with the problem, we are confronted with the fact that the legislative policy, clearly expressed, is to protect the bondholders of municipal authorities.[7] And it is the duty of the commission, the legislature's agency, to carry out the latter's undertaking. Appellant is not an ordinary public utility and the differences must be observed in the regulation of its rates. This is not to say that the full interest cost must be allowed in determining the allowable return. But it is to say that if, after proper rate base and allowable operating costs are determined, a reasonable return based thereon would be inadequate to enable appellant to meet its obligations to the bondholders or would seriously jeopardize the security of the bonds, an additional allowance should be made. And the consumers outside the borough limits should be required to carry their proper share of the burden.

We agree with the commission that the burden of proof was on appellant. There is a strong presumption that the legislature intended to fully implement the

---

[7] Section 6, Municipality Authorities Act, supra.

regulatory power of the commission wherever its jurisdiction attaches. One of its most effective implements is the requirement in section 302 of the Public Utility Law that every public utility, within the jurisdiction of the commission, shall file tariffs showing all rates. Circular No. 5 of the Public Service Commission, which was continued in effect by section 1404 of the Public Utility Law, provides that where there is a change in ownership the purchasing utility must subscribe to the existing tariffs of the seller. Appellant did not comply with this requirement and section 312 provides that where a complaint is filed before the challenged rates become effective the burden of establishing their reasonableness is on the utility.

We feel that the ends of justice require that the record be returned to the commission for a complete reconsideration of the case.

The order is vacated and the record returned for further proceedings in accordance with this opinion.