## United States of America, Appellant, v. Pennsylvania Public Utility Commission.

Argued November 15, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*E. Riggs McConnell*, with him *James E. Kilday*, *Victor R. Hansen*, Assistant Attorney General, and *W. Wilson White*, United States Attorney, for appellant.

*Jack F. Aschinger*, Assistant Counsel, with him *Thomas M. Kerrigan*, Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY RHODES, P. J., September 30, 1957:

The basic issue in this appeal is whether the Pennsylvania Public Utility Commission may lawfully regulate rates charged by a common carrier on wholly intrastate shipments of property of the United States of America.

On November 16, 1953, the commission, on its own motion, instituted an inquiry and investigation for the purpose of determining whether The Pennsylvania Railroad Company was transporting property free or at reduced rates for federal agencies or at charges other than as provided in its officially filed tariffs in violation of sections 303 and 304 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §§1143, 1144. The company filed an answer admitting that it offered to transport property for the United States at rates other than those published in its tariffs, but denying the violation of sections 303 and 304 of the Law. An initial hearing was held on March 22, 1954. The commission granted the petition of the United States to intervene. On June 15, 1954, the commission entered an order in which it found: "In the absence of express statutory authority to the contrary, transportation of property for State or Federal Government is within the scope of the [Public Utility] law." Accordingly, the commission ordered: "That The Pennsylvania Railroad Company cease and desist transportation of property for the Federal Government, or its agencies, at rates other than provided in its tariffs filed with the Commission." A petition of the United States for rehearing was refused. The United States appealed to this Court, and upon petition we remanded the record to the commission for further study and consideration, for supplementation of the record, to make specific findings of fact in detail, and to enter such an order as may be deemed just and proper in the premises. At

the remand hearing the United States presented evidence of its practices and problems in the transportation field as it relates to the matter of regulation of the common carriers used. On July 2, 1956, the commission affirmed its order of June 15, 1954, asserting its jurisdiction over the matter and enjoining the railroad from charging rates other than those in its tariffs filed with the commission. The matter is now before us on the appeal of the United States.

Appellant presents two questions for our consideration: "1. Does the Public Utility Law of Pennsylvania prohibit carriers from transporting property of the United States between points in the state at rates other than those contained in published tariffs? 2. Is a state statute which confers upon a state Commission the power to regulate the rates for the shipment of the property of the United States between points in the state unconstitutional?"

We observe that these questions are similar to those which were before us in *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania*, 148 Pa. Superior Ct. 261, 24 A. 2d 717, wherein we held that the sale of milk to the United States was subject to the minimum price fixed by the Milk Control Commission, and that such regulation was not unconstitutional. Our decision in the *Penn Dairies* case was affirmed on appeal to the Pennsylvania Supreme Court (344 Pa. 635, 26 A. 2d 431) and by the United States Supreme Court (318 U. S. 261, 63 S. Ct. 617, 87 L. Ed. 748).[1] It is our opinion that the principles applied in the *Penn Dairies* case are generally applicable to this case.

The initial inquiry is whether our Public Utility Law prohibits a carrier from charging rates other than

---

[1] The United States Supreme Court assumed the applicability of the Milk Control Act to sales to the United States and discussed only the constitutional issue.

those in its officially filed tariffs for the transportation of property of the United States. Section 303 of the Law, 66 PS §1143, relates to compliance with such filed tariffs and provides: "No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto then filed in the manner provided in this act. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this act: . . ." It is argued on behalf of the United States that section 303 does not apply to shipments of the United States because it simply prohibits a utility from demanding or receiving a greater or lesser rate "from any person, corporation, or municipal corporation," and does not specifically mention other governmental bodies such as the United States. We may assume for present purposes that the three categories mentioned in section 303 do not include the United States as they have been defined in the law.[2] It is our conclusion, however, that the Legis-

---

[2] Section 2 of the Law, 66 PS §1102, defines the three categories as follows:

"(9) 'Corporation' means all bodies corporate, joint-stock companies, or associations, domestic or foreign, their lessees, assignees, trustees, receivers, or other successors in interest, having any of the powers or privileges of corporations not possessed by individuals or partnerships, but shall not include municipal corporations, except as otherwise expressly provided in this act, nor bona fide cooperative associations which furnish service on a nonprofit basis only to their stockholders or members. . . .

"(15) 'Municipal Corporation' means all cities, boroughs, towns, townships, or counties of this Commonwealth, and also any public corporation, authority, or body whatsoever created or organized under any law of this Commonwealth for the purpose of rendering any service similar to that of a public utility.

lature did not intend to exclude shipments of the Federal Government by the mention of the three categories in section 303. The doctrine that the inclusion of certain classes infers the exclusion of others is an aid which may be used to ascertain the legislative intent; but it is not of universal application and it may not be applied where it would defeat the apparent intention of the Legislature. *Fazio v. Pittsburgh Railways Company,* 321 Pa. 7, 11, 12, 182 A. 696. The maxim does not apply where an examination of the entire statute indicates a more inclusive application than may appear from the reading of one section thereof. See *Fazio Unemployment Compensation Case,* 164 Pa. Superior Ct. 9, 11, 12, 63 A. 2d 489. We said in *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* supra, 148 Pa. Superior Ct. 261, 266, 24 A. 2d 717, 719, that to arrive at the real meaning of an act it is necessary to take a broad general view of it so as to obtain an exact conception of its purpose, scope, and object. See, also, *Rose Township v. Hollobaugh,* 179 Pa. Superior Ct. 284, 291, 116 A. 2d 323; *Swartley v. Harris,* 351 Pa. 116, 119, 40 A. 2d 409. The Public Utility Law is comprehensive, and an analysis of the relevant sections clearly indicates the legislative intent. The Pennsylvania Railroad Company is a carrier within the meaning of the Law. Section 2 (5), 66 PS §1102 (5). Furnishing transportation for property of the United States is a "service" which requires a certificate of approval from the commission.[3] Sections 201 (b), 202

---

"(16) 'Person' means individuals, partnerships, or associations, other than corporations, and includes their lessees, assignees, trustees, receivers, executors, administrators, or other successors in interest."

[3] "Service" is used in the Law "in its broadest and most inclusive sense." Section 2 (20), 66 PS §1102 (20).

See, also, section 2 (23), 66 PS §1102 (23), which defines "Transportation of Passengers or Property."

(c), 66 PS §§1121 (b), 1122 (c). The rates which are required by the Law to be just and reasonable (section 301, 66 PS §1141) and which are subject to regulation by the commission are defined as those "made, demanded, or received for any service within this act, offered, rendered, or furnished by such public utility, . . ." Section 2 (19), 66 PS §1102 (19). The utility is required to file with the commission its "tariff showing all rates established by it and collected or enforced, or to be collected or enforced, within the jurisdiction of the commission."[4] Section 302, 66 PS §1142. Before a utility may charge rates other than those in its officially filed tariffs, it must file such changes with the commission. Section 308, 66 PS §1148. Our examination of the Law in the foregoing respects indicates that the service furnished by The Pennsylvania Railroad Company to the United States was service within the meaning of the Law and that the rates charged therefor were required to be filed with the commission. There is no exception applicable to the United States indicated in any of the sections; on the contrary they are all-inclusive. We think it would be unreasonable to say that, after setting forth these essential requirements, the Legislature intended to permit a noncompliance with the established tariffs merely because the United States is not specifically enumerated in section 303. The comprehensive language used throughout the Law, especially in those sections relating to service, rates, and tariffs, amply demonstrates that section 303 was not intended to restrict the jurisdiction of the commission so as to exclude regulation of rates charged the United States.

---

[4] The filing of rates is of compelling importance to effective regulation. *United States v. Illinois Terminal Railroad Company,* 168 F. 546, 549.

The failure to mention the sovereign in section 303 does not exclude such service and rates. We recognize it is ordinarily presumed that statutes affect only private rights and do not embrace rights of the sovereign unless the latter is explicitly designated or clearly intended. *Commonwealth of Pennsylvania, State Employes' Retirement System v. Dauphin County*, 335 Pa. 177, 180, 181, 6 A. 2d 870. But where the statute is an expression of public policy the sovereign is not to be excluded unless the intention to exclude it is clearly made to appear.[5] *Pittsburgh Public Parking Authority Petition*, 366 Pa. 10, 13, 14, 76 A. 2d 620. Our Public Utility Law was enacted in the interest of state-wide public welfare (*Duquesne Light Company v. Upper St. Clair Township*, 377 Pa. 323, 336, 105 A. 2d 287; *Postal Telegraph-Cable Company v. Pennsylvania Public Utility Commission*, 154 Pa. Superior Ct. 340, 345, 346, 35 A. 2d 535), and its primary object is to serve the general public (*Posten Taxi Company v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 13, 18, 63 A. 2d 424). The Law provides for utility regulation in order to insure adequate service for the public at reasonable rates, and to prevent unlawful discrimination such as the granting of a preferential rate to some at the expense of other users of the same utility service.[6] It does not clearly appear that it was the intention of the Legislature to exclude service provided for the United States and rates charged therefor from regulation; in fact, we are convinced that the Law as a whole, its purpose, scope, and policy clear-

[5] "The intention to interfere with the state function of regulating intrastate rates is not to be presumed." *Arkansas Railroad Commission v. Chicago, Rock Island, and Pacific Railroad Company*, 274 U. S. 597, 603, 47 S. Ct. 724, 71 L. Ed. 1224, 1228.

[6] See section 801, 66 PS §1301, which is a declaration of policy concerning common carriers by motor vehicle.

ly reveal that it was intended to include all such service and rates. *United States v. Cooper Corporation,* 312 U. S. 600, 604, 61 S. Ct. 742, 85 L. Ed. 1071, 1074. See *United States v. Oklahoma Gas & Electric Co.,* 297 F. 575, 579, which upheld the regulation of rates for electricity supplied to the Government. The alleged long continued practice of noninterference by the commission in cases of special carrier contracts for the United States, if material at all, does not outweigh the fundamental purpose underlying the enactment of the Law in order to maintain an efficient, economical, transportation system for the public at rates which are reasonable and nondiscriminatory. See *State College Borough Authority v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 363, 372, 31 A. 2d 557.

The United States also contends that the reference to the three categories of customers in section 303 limits its application under the doctrine of "ejusdem generis." This rule is only an aid to construction; " '. . . it is never applied to defeat the real purpose of the statute, as that purpose may be gathered from the whole instrument.' " *United States v. Mescall,* 215 U. S. 26, 31, 30 S. Ct. 19, 54 L. Ed. 77, 79. See, also, *Com. v. Klucher,* 326 Pa. 587, 590, 193 A. 28.

We may not be unmindful that the regulation under the Law is that of The Pennsylvania Railroad Company, a common carrier. If it is permitted to use its equipment for intrastate carriage of property of the United States without being subject to regulation, it will be using equipment that otherwise would be used for carriage of property for ordinary patrons but charging rates other than those paid by such patrons.[7]

---

[7] A public utility performs a function of the state (*Smyth v. Ames,* 169 U. S. 466, 544, 18 S. Ct. 418, 42 L. Ed. 819, 848) ; and it must use all its receipts as though they were a public trust

See sections 401, 403, 66 PS §§1171, 1173. The utility is not permitted to establish or maintain any unreasonable difference as to rates. Section 304, 66 PS §1144. The strong public policy against unreasonable discrimination is firmly established in this Commonwealth not only by the Public Utility Law but by the Pennsylvania Constitution as well. Const. Art. 17, §3, as amended November 7, 1933, Const. PS.[8] Undue or unreasonable discrimination results if customers are treated differently although the services to be performed and the conditions under which those services are performed are alike in all material respects. *Hoover v. Pennsylvania Railroad Co.*, 156 Pa. 220, 229, 27 A. 282; *Paine & Co. v. The Pennsylvania Railroad Co.*, 14 Pa. C.C. 38, 45. Any inequality of charges or facilities must be justified by a difference of circumstances and situations. *Wright v. Baltimore & Ohio Railroad*, 32 Pa. Superior Ct. 5, 10. The fact that the Government is the customer is not such a material difference. *United States v. Oklahoma Gas & Electric Co.*, supra, 297 F. 575, 579. The difference must relate to the shipment not to the shipper. One of the shipments involved in the present case consisted of parachutes, engine parts, life rafts, and similar equipment which were to be transported from the United States Air Force Station at Marietta, Pennsylvania, to a commercial warehouse at Columbia, Pennsylvania. There is no reason why the United States should pay a lower proportionate rate than the manufacturer or supplier of these articles when they were originally shipped to Marietta. Such undue or unreasonable discrimination is prohibited. See *United States v. Oklahoma Gas & Electric Co.*, supra, 297 F. 575, 578, 579.

---

(*City of Fort Smith v. Southwestern Bell Telephone Company*, 247 S.W. 2d 474, 483).

[8] See, also, Art. 17, §§1, 7, Const. PS.

It follows that a partial or fractional regulation of carriers on the basis of the nature of the customer was not intended by the Legislature.

The other matter for consideration is whether the Law is constitutional as applied to rates charged for intrastate shipments of the United States. In *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* supra, 318 U. S. 261, 270, 63 S. Ct. 617, 87 L. Ed. 748, 754, it is stated: "The trend of our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents. We have recognized that the Constitution presupposes the continued existence of the states functioning in co-ordination with the national government, with authority in the states to lay taxes and to regulate their internal affairs and policy, and that state regulation like state taxation inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders, . . . And we have held that those burdens, save as Congress may act to remove them, are to be regarded as the normal incidents of the operation within the same territory of a dual system of government, and that no immunity of the national government from such burdens is to be implied from the Constitution which established the system, . . ." It is apparent that, whatever the immunity of the Federal Government may be, such immunity does not extend to those who render services to the Government such as The Pennsylvania Railroad Company. *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* supra, 318 U. S. 261, 269, 63 S. Ct. 617, 87 L. Ed. 748, 753. The mere fact that there may be an increased economic burden imposed by requiring The Pennsylvania Railroad Company to comply with

its established tariffs in performing services for the United States is not a valid basis for bringing the railroad company within any implied governmental immunity. *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* supra, 318 U. S. 261, 269, 63 S. Ct. 617, 87 L. Ed. 748, 753; *Alabama v. King & Boozer,* 314 U. S. 1, 9, 62 S. Ct. 43, 86 L. Ed. 3, 6.

The United States contends, however, that the particular nature of this transportation indicates that state regulation of the rates imposes an unreasonable burden upon the Federal Government. It is argued that the lines of supply of the United States are highly integrated and synchronized to operate on a worldwide basis, and that any local interference with that system is improper. In the present case we are concerned only with shipments which originate and terminate within the Commonwealth of Pennsylvania without crossing state lines. It is purely an intrastate transportation. When considered in the over-all governmental picture, it may have some relationship to the world-wide and national programs, but this fact alone does not make the obligation to pay established rates for transportation an unreasonable burden. Obviously, in the *Penn Dairies* case the supply of milk to the armed forces in training was part of the program of building and maintaining a healthy and effective fighting force during the Second World War. Nevertheless the requirement that the minimum price be paid for such milk when purchased in Pennsylvania did not impose an unconstitutional burden. We find no material difference between the *Penn Dairies* case and the present one in this respect.

It is also clear that the Law does not impose any duty or burden upon government officers or agents with respect to compliance therewith. The duty and the regulation are imposed upon the carrier which pro-

vides the transportation and charges the rate therefor. Compliance with the Law by the carrier in no way increases the responsibility of government officers or agents, and does not require any additional effort on their part in procuring transportation.

Counsel for the United States also argues that, because of the variety of commodities shipped by the military forces, there may not be an established tariff on file for certain items, and that this would result in a delay of the shipment while such tariffs are being filed and approved. We believe that the commission adequately answers this practical problem, if it is one, by referring to its regulations which would permit the railroad company to file a tariff covering such shipments and obtain concurrent commission approval. See, also, sections 302, 308 (a), 66 PS §§1142, 1148, which authorize the commission to expedite the filing and the approval of any new or changed rate. A witness for the United States in fact testified that there was no delay caused by such procedure. In this connection the United States also contends that, since certain shipments of military material may be of a secret nature, the requirement of filing rates for shipment thereof with the commission may require revealing the nature of the shipment or its secret destination. In such instances the Federal Government would not be obliged to reveal to the commission any more information than it would ordinarily reveal to the carrier which is to transport the property. The regulation of rates for carriage does not require any breach of security or the extended dissemination of information which might lead to a breach of security.

It is further contended that the state regulation of rates conflicts with a specific congressional policy that all government shipments be made by special arrangement free from regulation. This purported congres-

sional policy is apparently based upon the general government requirement of competitive bidding and upon section 22 of the Interstate Commerce Act, 49 U.S.C.A. 22, which permits interstate governmental shipments free or at reduced rates. The policy in favor of competitive bidding is not so strong as to prevent local regulation of rates. In *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* supra, 318 U. S. 261, 274, 275, 63 S. Ct. 617, 87 L. Ed. 748, 756, as to a similar contention, it was said: "Evidence is wanting that Congress, in authorizing competitive bidding, has been so concerned with securing the lowest possible price for articles furnished to the government that it wished to set aside all local regulations affecting price. . . . An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous." Moreover, the fact that section 22 of the Interstate Commerce Act, 49 U.S.C.A. 22, permits interstate shipments for the Federal Government to be handled free or at reduced rates does not indicate a congressional policy that intrastate shipments with respect to rates be free of local regulation. Section 22 recognizes that shipments for the Federal Government may be made subject to certain regulation without placing any undue burden upon the Government. See *Nashville, Chattanooga & St. Louis Railway v. Tennessee,* 262 U. S. 318, 43 S. Ct. 583, 67 L. Ed. 999.

The United States relies to some extent upon *United States v. Public Utilities Commission of California,* 141 F. Supp. 168, which held the Public Utility Code of California unconstitutional in so far as it "purports to authorize the Public Utilities Commission of California to impose 'such conditions as it may consider

just and reasonable' upon the granting of reduced rates by commercial carriers in favor of the [United States], . . ." 141 F. Supp. 168, 190. The California Code is different from our Law which does not permit such free or reduced rates. Our Law requires that the officially filed tariffs be complied with regardless of the shipper. The order of the commission in the present case is merely that The Pennsylvania Railroad Company comply with the established tariffs. The order does not purport to impose any further regulation or condition upon the shipment of property for the Federal Government or subject it, its officers, or agents to any regulation as might be possible under the California Code. Under our Law the Federal Government is to be treated as any other customer. The California Code may be too broad with respect to the imposition of conditions and regulation of government shipments in a manner different from ordinary customers. Moreover, we are not in complete accord with the reasoning in *United States v. Public Utilities Commission of California,* supra, 141 F. Supp. 168. That decision does not in any way control the determination of the present appeal or announce principles which would be presently applicable.[9]

Admittedly the use of intrastate carriers and utilities by the Federal Government is substantial. It must be recognized, however, that the commission could not adequately regulate such carriers and utilities if the business of the Federal Government were exempt from commission regulation. Our Public Utility Law was intended to apply generally. In view of the lack of any substantial burden upon the United States or interference therewith, we conclude that the provisions of

---

[9] There has been no disposition of the appeal pending in the United States Supreme Court, No. 447, October Term, 1956.

the Law relating to the power to regulate intrastate rates are constitutional, and that the commission had jurisdiction to enter the order requiring The Pennsylvania Railroad Company to comply with its established tariffs in the absence of express statutory authority to the contrary.

The orders are affirmed.