# United States of America, Appellant, *v.* Pennsylvania Public Utility Commission.

538

Argued April 24, 1958.   Before JONES, C. J., BELL, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*E. R. McConnell,* with him *Henry P. Sullivan,* Assistant United States Attorney, and *Harold K. Wood,* United States Attorney, for appellant.

*Jack F. Aschinger,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for appellee.

OPINION BY MR. JUSTICE BELL, June 30, 1958:

This is an appeal by the United States from a unanimous opinion by the Superior Court affirming an Order of the Pennsylvania Public Utility Commission enjoining the Pennsylvania Railroad from charging the Federal Government railroad rates other than those filed in its tariffs with the Public Utility Commission.

The facts are these: In the Fall of 1953 the Pennsylvania Railroad quoted a *special* rate to the United States for the carriage of certain Air Force material from the Marietta Air Force Station in Pennsylvania to a commercial warehouse at Columbia, Pa., for storage. The material consisted of parachutes, engine parts, life rafts and similar equipment. *The special rate was lower than the regular tariff rate* published by the Railroad for commercial shipments of a similar nature. The Pennsylvania Public Utility Commission after investigation and hearings determined that the Railroad was transporting or offering to transport property for Federal Agencies in violation of §§303 and 304 of the Public Utility Law of Pennsylvania (Act of May 28, 1937, P.L. 1053, as amended, 66 PS 1142, 1143). Briefly stated, these two sections prohibit the carrier from carrying property for "any person, corporation or municipal corporation" at a rate less than the rates contained in tariffs published and filed with the Commission, or granting any such "person, corporation or municipal corporation" an unreasonable preference or advantage. The Railroad and the Government of the United States denied any violation of the Public Utility Law in quoting these lower rates to the United States. The Superior Court affirmed the Commission's action.

We shall summarize and briefly discuss the important contentions made by each party. The United

States contends that it is not included within the definition of "person, corporation or municipal corporation", as employed in §§303 and 304 or elsewhere in the Act* and consequently they do not apply to or include the Federal Government, either generally or under the theories of ejusdem generis and expressio unis. It is unnecessary to decide this question since we prefer to place our decision upon the broader ground hereinafter discussed.

The Superior Court analyzed the relevant portions of the statute and concluded that the comprehensive language used throughout the Act, especially in those sections relating to service, rates and tariffs, none of which excluded the United States, demonstrated that §§303 and 304 were not intended to restrict the jurisdiction of the Commission so as to exclude regulation of rates charged the United States. The Superior Court also stated (a) that a partial or fractional regulation of carriers varying on the basis of the nature of the shipper as compared to the nature of the shipment, was not intended by the Legislature, and (b) that this was especially true in light of the fact that the Public Utility Law prohibits unreasonable discrimination among shippers unless the inequality of charges or facilities is justified by a difference in circumstances or situation. The fact that the Government is the customer has been held not to be such a material difference: *United States v. Oklahoma Gas and Electric Co.*, 297 Fed. 575.

Most important, the United States contends that the Public Utility Law if applied to the United States— even in intrastate commerce—would impose an unreasonable burden and an unreasonable delay on the discharge of certain of its Constitutional functions, i.e.,

---

* The Government points out that such special arrangements were tacitly approved by the Commission until 1952 when they were questioned for the first time.

supplying the Armed Forces and other related defense functions. The Public Utility Law imposes a duty on the carrier but does not impose any duty on the United States or its officers with respect to compliance therewith. The Superior Court believed, contrary to the Government's contention, that the United States would not be required to divulge classified or security information as a result of the carrier's compliance with the Act. That Court mainly relied on *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania,* 318 U.S. 261, 274, 275. In that case, which involved the Pennsylvania Milk Control Law, a renewal of the license of a milk dealer was refused by the Milk Control Commission because the dealer, in violation of the state law, had sold milk to the United States at prices below the minima fixed by the Commission. The sales and deliveries were made within the State, under a contract awarded the dealer, as the lowest bidder, for supply milk for consumption by troops at an Army camp established by the United States, on land belonging to the State, under a permit which involved no surrender of the State's jurisdiction or authority over the area. The Supreme Court held that in these circumstances, an application of the state law to the dealer was not precluded by the Constitution or laws of the United States. However, after the decision of the Superior Court was filed, the *Penn Dairies* case was distinguished in *P.U.C. of California v. United States of America,* (decided on March 3, 1958), and this recent case controls the instant case.

In *P.U.C. of California v. United States of America,* 355 U. S. 534, Justice Douglas, speaking for a majority of the Court, said: "Section 530 of the California Public Utilities Code, Cal. Stat. 1955, c. 1966, provides in part: 'Every common carrier subject to the provisions of this part may transport, free or at reduced rates: (a) Persons for the United States, .... The commission

may permit common carriers to transport property at reduced rates for the United States, state, county, or municipal governments, to such extent and subject to such conditions as it may consider just and reasonable . . . .'

"There is a large volume of military traffic between points in California. For many years the United States has negotiated special agreements with carriers as to the rates governing the transportation of government property. Property for the armed services has usually been transported at negotiated rates substantially equal to or lower than those applicable to regular commercial shipments.

"The United States filed this suit for declaratory relief, 28 U.S.C. §2201, in a three-judge District Court, asking that §530 be declared unconstitutional insofar as it prohibits carriers from transporting government property at rates other than those approved by the Commission and requesting relief by injunction.

"The District Court rendered judgment for the United States, 141 F. Supp. 168. . . .

". . . §486 requires common carriers to file their rates with the Commission. Section 493 provides that no common carrier shall engage in transportation until its schedules of rates have been filed. Section 494 provides that no common carrier 'shall charge, demand, collect, or receive a different compensation for the transportation of persons or property . . . than the applicable rates . . . specified in its schedules filed. . .' . . .

"The Commission has plainly indicated an intent to enforce the Act; and prohibition of the statute is so broad as to deny the United States the right to ship at reduced rates, unless the Commission first gives its approval. . . .

". . . The question is whether the United States can be subjected to the discretionary authority of a state

agency for the terms on which, by grace, it can make arrangements for services to be rendered it. . . .

"Assuming, arguendo, that the Act [Johnson Act, 62 Stat. 932] applies to the sovereign who made it, there is no violation of its mandate in the relief granted here. In the present case, the challenge is not to a rate 'order' but to a statute which requires the United States to submit its negotiated rates to the California Commission for approval. The United States wants to be rid of the system that subjects its procurement services to that form of state supervision.

"We come to the merits. Congress has provided a comprehensive policy governing procurement. 10 U.S.C. §§2301-2314. While competitive bidding is the general policy, §2304 provides that 'the head of an agency may negotiate such a purchase or contract, if . . . (2) the public exigency will not permit the delay incident to advertising; . . . (10) the purchase or contract is for property or services for which it is impracticable to obtain competition; . . . (12) the purchase or contract is for property or services whose procurement he determines should not be publicly disclosed because of their character, ingredients, or components; . . .'

"The regulations, promulgated to carry out these statutory provisions, are numerous and extensive. . . .

"It seems clear that these regulations—which have the force of law, Leslie Miller, Inc. v. Arkansas, 352 U.S. 187; Standard Oil Co. v. Johnson, 316 U.S. 481— sanction the policy of negotiating rates for shipment of federal property and entrust the procurement officers with the discretion to determine when existing rates will be accepted and when negotiation for lower rates will be undertaken. It also seems clear that under §530 of the California Public Utilities Code this discretion of the federal officers may be exercised and reduced rates used only if the Commission approves.

The question is whether California may impose this restraint or control on federal transportation procurement.

". . .Penn Dairies v. Milk Control Comm'n, 318 U.S. 261, can likewise be put to one side. There the question, much mooted, was whether the federal policy conflicted with the state policy fixing the price of milk which the United States purchased. The Court concluded that the state regulation 'imposes no prohibition on the national government or its officers.' Id., at 270. . . . Here the conflict between the federal policy of negotiated rates and the state policy of regulation of negotiated rates seems to us to be clear."*

"Moreover, no rates exist for much of the military traffic, which means that, unless the United States can negotiate rates for each shipment, the shipments would be delayed for Commission action unless shipped under the established rates which are higher than negotiated rates. . . . Affirmed."

The judgment of the Superior Court is reversed.

---

* In a dissenting opinion by Mr. Justice HARLAN, in which the Chief Justice and Mr. Justice BURTON joined, it is said: "In Penn Dairies, the Court upheld a Pennsylvania law setting minimum prices for milk as applied to a dealer selling milk in Pennsylvania to the United States for consumption at military camps. I can see no constitutional distinction between state regulation of the price of milk the Government must buy and of the price at which the Government must ship the milk it has bought."