Anne T. LAW, Administratrix of the Estate of Sewell Robert Dickerson, Appellee,

v.

READING COMPANY, Appellant,

v.

UNITED EASTERN COAL SALES CORPORATION, Appellees.

No. 13760.

United States Court of Appeals Third Circuit.

Argued Feb. 9, 1962.

Reargued Nov. 21, 1962.

Decided Jan. 21, 1963.

Arthur R. Littleton, Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellant.

Alexander F. Barbieri, Philadelphia, Pa. (Carl M. Mazzocone, Erskine, Barbieri & Sheer, Philadelphia, Pa., on the brief), for plaintiff appellee.

Victor L. Drexel, Philadelphia, Pa. (John B. Hannum, III, Philadelphia, Pa. on the brief), for appellee United Eastern Coal Sales Corp.

Before BIGGS, Chief Judge, McLAUGHLIN, Circuit Judge, and SHERIDAN, District Judge.

McLAUGHLIN, Circuit Judge.

Reading Company owns a trestle in Philadelphia beneath which it has coal bins. The bins extended down from the tracks to about thirteen feet above the ground. Reading leased part of the area, containing forty-eight bins, to United Eastern Coal Sales Corporation. Dickerson, the deceased, was an employee of the latter. On June 9, 1954, he and a co-worker had a truck under one of the said leased bins (# 56) and were filling it with coal from the bin. The flow of the coal stopped and Dickerson, for the pur-

pose of correcting the clogged condition, climbed up a ladder attached to the wall of the bin to the trestle. Shortly after that a dull thud was heard within the bin and Dickerson was found there with his head buried in the fine coal which was all around him. He could not be revived. It is stipulated that he died of suffocation.

After the accident the third rung from the top of the ladder was found to have been torn loose from the left side of the ladder and hanging down from the right side to which it was still attached. Based on the circumstances then present there was testimony that the break was fresh. And there was evidence that the ladder was "makeshift", poorly and defectively constructed. For at least ten years past it had been located where it was at the time Dickerson fell. The lease gave Reading authority to inspect the demised premises at any time. Reading did make such inspections and did make extensive repairs to the premises including the bins. The last time prior to the accident it repaired Bin # 56 was on April 28, 1953.

Plaintiff, as administratrix of the estate of the deceased, sued Reading which joined United Eastern as a third-party defendant. The case was tried in January of 1959. The jury in awarding a verdict to plaintiff found both the defendant and the third-party defendant negligent. The court denied Reading's motion for judgment and in the alternative for a new trial. Reading's motion for summary judgment against United Eastern under an indemnity provision in the lease between the parties was also denied, the court holding that Reading was not entitled to be indemnified by the lessee.

There is no need of going into any further factual detail. If the Reading Company owed a duty to Dickerson as an employee of United Eastern to keep the premises safe or to use care to do so, plainly there was enough trial evidence to warrant the plaintiff's verdict.

We think the landlord owed Dickerson that duty. By the tenth condition of the

lease United Eastern's responsibility for maintenance and repairs was confined to:

"* * * all appurtenant sidewalks, driveways, curbs, cellar doors, awnings and other facilities located in, on or over said sidewalks and driveways during the term of this lease or any extension or renewal thereof * * *"

██ The trial court held as a matter of law, properly in our judgment, that the condition did not include the bins; that this was not where a landlord merely reserved its right to maintain and repair but in designating with particularity the scope of the tenant's responsibility for maintenance and repair, it impliedly agreed to keep the bins and their appurtenances in good repair. The proofs, as we have said, support the conclusion that the railroad did not do so and that the accident involved was caused thereby.

█ Dickerson's status as a "patron" of the railroad under the protection of the Pennsylvania Public Utility Code, Section 1171[1] is upheld in the concurring opinion of Chief Judge Biggs. That opinion also makes it very clear that the Reading Company was using its side track unit, including the particular bin ladder, in its public utility functioning under the Pennsylvania Public Utility Code, 66 P.S. § 1102(10). In addition, the Pennsylvania governing decisional law has now pretty much dispelled any doubt that might have heretofore existed about Dickerson also coming under the protection of the same section of the Code as a member of the public. In West Penn Power Co. v. Pa. P.U.C., 199 Pa. Super. 25, 184 A.2d 143 (Sept. 13, 1962) it was held that the public to whom a public utility owed the duty of care included the employees of a farmer over whose land the utility's proposed right of way was to extend. The court, page 32, quoted with approval its statement in

Lower Chichester Township v. Pa. P.U.C., 180 Pa.Super. 503, 119 A.2d 674 (1956):

" 'The public for whose convenience, accommodation, safety, and protection the Public Utility Law is concerned does not consist solely of persons served by the utility, but also includes persons generally who may come into contact with the utility's facilities'."

It went on to say:

"We cannot agree with appellant's argument that public safety is not involved in the instant case. There is an abundance of testimony in the present record to support the conclusion that persons lawfully using the Simmons property would constantly be exposed to the hazard created by the proposed line. We are of the opinion that such persons are members of the public within the meaning of the statute."

█ The Lower Chichester Township opinion passed upon the word "public" in Section 1171 which is our present concern. See also Postal Telegraph-Cable Co. v. Pa. P.U.C., 154 Pa.Super. 340, 345–46, 35 A.2d 535 (1944). And it is the settled Pennsylvania law that the Public Utility Code must be broadly construed in order for it to accomplish its expressed objectives. Commonwealth v. McHugh, 406 Pa. 566, 178 A.2d 556 (1962); United States v. Pa. P.U.C., 184 Pa.Super. 380, 135 A.2d 93 (1957), reversed on other grounds, 393 Pa. 537, 143 A.2d 341, cert. den. 358 U.S. 884, 79 S.Ct. 126, 3 L.Ed.2d 112 (1958).

█ Plaintiff argues that there was no landlord-tenant relationship with respect to the ladder. The theory is that the bin and its ladder were part of the side track complex as to which the railroad reserved full common carrier use. In the lease Reading had reserved to it-

---

1. As applicable here Section 1171 reads: "Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations * * * and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employes, and the public. * * *"

self "the right to use the side tracks constructed on the herein demised premises in the performance of its common carrier duties." It seems to us that, while United Eastern was substantially restricted in its use and occupation of the bin, its status nevertheless was that of tenant. But not to a landlord completely out of control as would be essential in order to bring the appeal under the doctrine of Harris v. Lewistown Trust Co., 326 Pa. 145, 191 A. 34, 110 A.L.R. 749 (1937). Even if appellant's contention that Reading was out of possession of the premises was to be accepted, the circumstance that it did make repairs to the premises would strongly suggest Reading's assumption of control of the bins with respect to liability for their condition. Greco v. 7-Up Bottling Company of Pittsburgh, 401 Pa. 434, 165 A.2d 5 (1960).

There remains the claim by Reading for indemnification from United Eastern for its costs and damages resulting from plaintiff's suit. This is based on the twelfth paragraph of the lease which reads:

"TWELFTH.—The Lessee shall and will release, indemnify, protect and save harmless the Lessor, Philadelphia, Germantown and Norristown Railroad Company and their respective successors and assigns, from all costs or expenses resulting from any and all loss of life or property, or injury or damage to the person or property, of any person, firm or corporation (including the parties hereto and their officers, agents and employees) and from and against any and all claims, demands or actions for such loss, injury or damage, in any manner arising out of, resulting from or connected with the use, condition or occupancy of the demised premises, including any appurtenant sidewalks or driveways, *except when caused by or resulting from the negligence of Lessor, its officers, agents or employees, in the performance during the term of this lease, or any extension or renewal thereof, of work upon or within the demised premises.*" (Emphasis supplied).

No real dispute exists regarding the controlling Pennsylvania law. Absent the exception in the above paragraph, its general indemnification language would not be enough to include within it plaintiff's judgment in this suit which is founded on Reading's own negligence together with that of United Eastern. Pittsburgh Steel Company v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185 (1961). As in that decision, paragraph 12 down as far as the exception has no clearly expressed or unequivocal language to show that indemnification of Reading for its own fault was intended and in that circumstance it will not be so construed. Perry v. Payne, 217 Pa. 252, 262, 66 A. 553, 11 L.R.A.,N.S., 1173 (1907).

That brings us to the exception which in effect states that there shall be no indemnity to Reading when the loss is caused by the latter "* * * in the performance * * * of work upon or within the demised premises." The trial judge saw that this brought into focus the proposition that the indemnity to Reading included reimbursement from loss resulting because of a condition of the leased premises for which it was liable and occurring at a time when it was not performing any work in connection with the bin. The court considered that, in view of its holding Reading accountable for the bin's repair, (with which we agree) the exception clause was surplusage. It quite rightly ruled further that if all this resulted in the lease becoming ambiguous, the latter must be construed most strongly against Reading, the party who drew it. Prudential Ins. Co. etc. v. Goodman and Theise, Inc., 396 Pa. 366, 367, 370, 152 A.2d 664 (1959). It concluded that the intention of the lessee to be bound to indemnify the lessor from loss occasioned by its own negligence was not expressed beyond doubt in clear and unequivocal language and therefore "the lessor was not entitled to be indemnified by the lessee." We are unable to agree with that position because the

exception appears as an integral part of the indemnification clause of the lease. There is nothing to indicate that it was other than deliberately included by the parties. It does, we think, plainly name the only basis under which Reading is not to be indemnified from a loss connected with the leased premises. It is the Pennsylvania law that "In construing a contract the intention of the parties must be ascertained from the entire instrument, and each and every part of it must be taken into consideration and given effect if reasonably possible." Foulke v. Miller, 381 Pa. 587, 593, 112 A.2d 124, 127 (1955). Acting under that mandate, from the facts before us, we are convinced that the exception clause of paragraph 12 points with certainty to Reading's contractual right to indemnity from United Eastern. Seaboldt v. Pennsylvania Railroad Company, 290 F.2d 296, 298 (3 Cir., 1961).

The judgment of the district court as to the negligence of Reading Company and United Eastern Coal Sales Corporation will be affirmed. The order denying Reading's motion for summary judgment against United Eastern under the indemnification clause of the lease will be reversed and remanded to the district court with direction to enter judgment thereon in accordance with the terms of said clause.

BIGGS, Chief Judge (concurring).

The majority opinion has left little for me to say but I think nonetheless that I should explain my position. The Pennsylvania Public Utility Code, Pa. Stat.Ann. tit. 66, Section 1102(10), defines "'Facilities'" as "the plant and equipment of a public utility, including * * * any and all means and instrumentalities in any manner * * * used * * * for, by, or in connection with" its business.

The evidence was sufficient to justify the jury in finding that the Railroad Company was employing the sidetrack complex, including the wooden ladders of the bins, in particular the ladder attached to the side of Bin 56, in connection with its business as a common-carrier public utility. The record shows that in 1955 the Railroad Company inspected the bins and made extensive repairs to the sidetrack complex. In making this statement I am aware that the Reading Company points out that the defective ladder that apparently caused Dickerson's death was attached to the wooden side of the bin and not the side of the concrete trestle which alone supported the sidetrack. Nonetheless it must be concluded that the complex of the siding and its coal dispensing bins, including the ladders, were integral parts of the facilities used by Reading in its service as a public utility for the purpose of making coal available to United Eastern Coal Sales Corporation or its agency, the Adam Coal Company, a division of United, and Reading's other lessees. In sort, individual facilities of the siding complex, such as the wooden ladder of Bin 56, cannot be divorced properly from the whole complex. It follows that Section 1171 of the Pennsylvania Public Utility Code which requires every public utility to furnish and maintain safe facilities and to make such repairs "as shall be necessary * * * for * * * the safety of its patrons, employees and the public", is applicable.

Reading lays great emphasis on the provision of Section 1500 of the Public Utility Code providing that the Code shall not be held or construed to alter or repeal the theretofore established rules covering liability of public utilities for negligence. It must be conceded that this presents a serious obstacle to the point of view asserted in this opinion. In the former concurring opinion, filed on May 8, 1962, now withdrawn, I stated that I could not perceive how Dickerson could be said to be a member of the "public" as that word is employed in Section 1171 of the Public Utility Code, citing Postal Telegraph-Cable Co. v. Pennsylvania Pub. Util. Comm'n, 154 Pa.Super. 340, 344–346, 35 A.2d 535, 537–538 (1944), and having had in mind the strictures of Section 1500. But the case at bar is a diversity case and not only is the statute law of Pennsylvania applicable but the inter-

pretations of that law by the higher courts of the Commonwealth must be heeded by us as well.

The Superior Court of Pennsylvania in West Penn Power Co. v. Pennsylvania Pub. Util. Comm'n, 199 Pa.Super. 25, 32, 184 A.2d 143, 146 (1962), stated the following: "[The appellant power company's] third and final contention is that the Commission also erred in finding that the proposed right-of-way will create a situation involving hazard to the public. In Lower Chichester Township v. Pennsylvania Public Utility Commission, 180 Pa.Super. 503, 119 A.2d 674, we made the following pertinent statement: 'The public for whose convenience, accommodation, safety, and protection the Public Utility Law is concerned does not consist solely of persons served by the utility, but also includes persons generally who may come into contact with the utility's facilities'. We cannot agree with appellant's argument that public safety is not involved in the instant case. There is an abundance of testimony in the present record to support the conclusion that persons lawfully using the Simmons property would constantly be exposed to the hazard created by the proposed line. We are of the opinion that such persons are members of the public within the meaning of the statute."

An examination of the facts in the cited case shows that the intervenors, the Simmonses, owned a farm in Pennsylvania, and operated it with the aid of an irrigation system which by reason of unavoidable breakage, might project water as high as one hundred feet into the air, bringing a stream of water or a section of pipe into contact with the transmission conductors with the power of the West Penn Power Company, which might cause "any person in physical contact with the piping of the irrigation system" to "suffer injury or death by electrical shock." West Penn Power Co. v. Pennsylvania Pub. Util. Comm'n, supra 199 Pa. at 29–30, 184 A.2d at 145. It is my conclusion that Judge Wright deemed not only the Simmonses themselves but also intended their employees to be included as members of the "public" within the ambit of the Public Utility Act. Whatever may be said as to the strength of the logic advanced by Reading based on Section 1500, and it is strong, I think it cannot be denied that a very apt analogy is presented between the legal position of an employee of the Simmonses vis-a-vis West Penn and Dickerson, an employee of United Eastern, vis-a-vis Reading. I therefore am of the view that Dickerson was entitled to recover from Reading for there is sufficient evidence to support a charge of negligence on the part of Reading.

I concur in the view also expressed in the majority opinion that Reading is entitled under the indemnification clause of the lease to indemnification as indicated.